UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

| | |
|---|---|
| Zoe Kaplan, Jack Flom, and Samira Hassan, *on behalf of themselves and other similarly situated individuals*, | Case No. _____ |
| Plaintiffs, | |
| v. | |
| | **CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL** |
| Minnesota Department of Public Safety Commissioner John Harrington, *in his individual and official capacity*; Minnesota Department of Natural Resources Commissioner Sarah Strommen, *in her individual and official capacity*; Minnesota State Patrol Colonel Matthew Langer, *in his individual and official capacity*; Hennepin County Sheriff David Hutchinson*, in his individual and official capacity*, and John Does 1-10, *in their individual and official capacities*. | |
| Defendants. | |

---

## <u>INTRODUCTION</u>

In April 2021, protests erupted in Brooklyn Center, Minnesota, after police killed a young black man named Daunte Wright.  The law enforcement response to these protests included the unnecessary and unconstitutional use of force on protesters.  It also included

the unconstitutional arrest and prolonged detention of protesters. To effectuate this prolonged detention under Minnesota law, Defendants apparently generated dozens of knowingly false statements of probable cause that Plaintiffs and the Plaintiff Class had engaged in rioting, when Defendants knew this was not true. This premeditated scheme of arrest and prolonged detention was an attack on the constitutional rights of Plaintiffs and the Plaintiff Class.

## PARTIES

1.      Plaintiff Zoe Kaplan is a Minnesota resident. They[1] were arrested on April 13, 2021, while peacefully protesting in Brooklyn Center, and wrongly detained for approximately 40 hours in the Hennepin County Jail on purported probable cause riot before finally being released. Plaintiff Kaplan intends to participate in future public protests.

2.      Plaintiff Jack Flom is a Minnesota resident. He was arrested on April 13, 2021, during a peaceful protest in Brooklyn Center, and wrongly detained for more than 40 hours in the Hennepin County jail on purported probable cause riot before finally being released. Plaintiff Flom intends to participate in future public protests.

3.      Plaintiff Samira Hassan is a Minnesota resident. She was arrested on April 14, 2021, while picking her brother up after a peaceful protest in Brooklyn Center. She was wrongly detained for more than 24 hours in the Hennepin County Jail on purported

---

[1] Plaintiff Kaplan identifies using they/them pronouns and is referred to accordingly in this Complaint.

probable cause riot before finally being released.  Plaintiff Hassan intends to participate in future public protests.

4.      Defendant John Harrington is the Minnesota Commissioner of Public Safety with supervisory responsibility over Colonel Matthew Langer and the Minnesota State Patrol.   Commissioner Harrington is a Minnesota resident.   At all times relevant, Commissioner Harrington was one of the chief policymakers of the Minnesota Department of Public Safety and the Minnesota State Patrol. At all times relevant, Commissioner Harrington ordered, authorized, and/or acquiesced in the violations of Plaintiffs' rights and the rights of the Plaintiff Class as alleged herein. At all times relevant, Commissioner Harrington was acting under color of state law, within the course and scope of his official duties and in accordance with the customs, policies, and practices of the Department of Public Safety.  Commissioner Harrington is sued in his official and individual capacities.

5.      Defendant Sarah Strommen is the Minnesota Commissioner of the Department of Natural Resources ("DNR") with supervisory responsibility over the DNR's conservation officers.   Commissioner Strommen is a Minnesota resident.   At all times relevant, Commissioner Strommen was one of the chief policymakers of the Minnesota Department of Natural Resources.  At all times relevant, Commissioner Strommen ordered, authorized, and/or acquiesced in the violations of Plaintiffs' rights and the rights of the Plaintiff Class as alleged herein. At all times relevant, Commissioner Strommen was acting under color of state law, within the course and scope of her official duties and in accordance with the customs, policies, and practices of the Department of Natural Resources. Commissioner Strommen is sued in her official and individual capacities.

6.      Defendant Colonel Matthew Langer commands the Minnesota State Patrol. Colonel Langer is a Minnesota resident.  At all times relevant, Colonel Langer was one of the chief policymakers of the Minnesota State Patrol. At all times relevant, Colonel Langer ordered, authorized, and/or acquiesced in the violations of Plaintiffs' rights and the rights of the Plaintiff Class as alleged herein. At all times relevant, Colonel Langer was acting under color of state law, within the course and scope of his official duties and in accordance with the customs, policies, and practices of the Department of Public Safety.  Colonel Langer is sued in his official and individual capacities.

7.      Defendant David Hutchinson is the Hennepin County Sheriff.  Sheriff Hutchinson is a Minnesota resident.  At all times relevant, Sheriff Hutchinson was one of the chief policymakers of the Hennepin County Sheriff's Office. At all times relevant, Sheriff Hutchinson ordered, authorized, and/or acquiesced in the violations of Plaintiffs' rights and the rights of the Plaintiff Class as alleged herein. At all times relevant, Sheriff Hutchinson was acting under color of state law, within the course and scope of his official duties and in accordance with the customs, policies, and practices of the Hennepin County Sheriff's Office.  Sheriff Hutchinson is sued in his official and individual capacities.

8.      Defendants John Does are unidentified individuals who committed the unconstitutional acts and omissions set forth below as agents of the Minnesota State Patrol, Minnesota Department of Natural Resources, and Hennepin County Sheriff's Office, and at all times were acting under color of state law, within the course and scope of their official duties and in accordance with the customs, practices, and policies of their employing agency.  Defendants solely possess the information necessary to identify the John Does.

## JURISDICTION AND VENUE

9.      Plaintiffs' claims arise under 42 U.S.C. § 1983, the Fourteenth Amendment to the United States Constitution, and the First and Fourth Amendments, as incorporated against the States, their agencies, and their municipal divisions through the Fourteenth Amendment.

10.     Jurisdiction is proper in this Court according to 28 U.S.C. § 1331 because Plaintiffs' claims arise under the United States Constitution and federal law.

11.     This Court has supplemental jurisdiction over the included Minnesota state law claims pursuant to 28 U.S.C. §1367.

12.     Venue is proper in this district under 28 U.S.C. § 1391, as Defendants reside in this district, and the events or omissions giving rise to the claims set forth herein occurred in this district.

13.     Plaintiffs demand a trial by jury pursuant to Fed. R. Civ. P. 38(b).

## THE DAUNTE WRIGHT KILLING AND RESULTING PROTESTS

14.     On April 11, 2021, a Brooklyn Center police officer shot and killed Daunte Wright, an unarmed Black man, during a traffic stop purportedly initiated because of Wright's expired automobile tabs.

15.     The killing of Daunte Wright generated large protests against law enforcement violence and discrimination.  These protests occurred primarily outside the Brooklyn Center City Hall where the Brooklyn Center Police Department is headquartered and continued through April 17, 2021.

16.     Defendants and their agents and employees provided the bulk of the law enforcement resources responding to the Daunte Wright protests in Brooklyn Center.

17.     On April 12, 2021, Governor Walz signed Emergency Executive Order 21-17 declaring a peacetime emergency in the wake of the killing of Daunte Wright and ordering "state agencies, in cooperation with appropriate federal agencies, to assist local units of government as they respond to and recover from this emergency."

18.     Also on April 12, 2021, Governor Walz signed Emergency Executive Order 21-18.  It imposed a curfew on all public areas within Anoka, Dakota, Hennepin and Ramsey counties from 7:00 p.m. on April 12 until 6:00 a.m. on April 13.

19.     On April 13, 2021, Brooklyn Center Mayor Mike Elliott imposed a city-wide curfew from 10:00 p.m. to 6:00 a.m.

20.     On April 14, 2021, Mayor Elliott again imposed a city-wide curfew from 10:00 p.m. to 6:00 a.m.

21.     On April 16, 2021, Mayor Elliott issued a last-minute curfew order at roughly 10:30 p.m. for a curfew lasting from 11:00 p.m. to 6:00 a.m.

## OSN AND DEFENDANTS' COORDINATION

22.     Operation Safety Net ("OSN") is an unincorporated association of law enforcement agencies that assembled to plan for and conduct crowd control operations during the protests expected to occur during the murder trial of Derek Chauvin and the trials of the other MSP officers who participated in the murder of George Floyd.

23.     OSN is comprised of the Hennepin County Sheriff's Office, the Minneapolis Police Department, the St. Paul Police Department, the Ramsey County Sheriff's

Department, Metro Transit Police, the Minnesota State Patrol, the Minnesota Department of Public Safety, the Minnesota Department of Natural Resources, the Minnesota Department of Homeland Security and Emergency Management and the Minnesota National Guard.

24.     OSN and its constituent agencies referred to OSN as a "joint working group" and a "unified command" among other things.

25.     OSN maintained a public relations operation, which included a dedicated OSN twitter feed and website.

26.     The OSN member agencies acted in concert with one another during the Daunte Wright protests.   The agencies, including Defendants, communicated and coordinated strategy, tactics and operations on the ground during the protests in Brooklyn Center.

27.     OSN operated as a vehicle by which the Defendants conspired to and did violate Plaintiffs' constitutional rights.

28.     OSN coordinated use of State Patrol aviation and Closed-Circuit TV resources to obtain real-time surveillance of the protests to monitor the protests and related law enforcement activities, and Defendants knew of and participated in this surveillance and monitoring.

29.     OSN agencies used specialized radio and digital technologies, including the "Intrepid" system, to enable communication by personnel across the different agencies, and to further effectuate coordinated planning and action, including the unconstitutional conduct described herein.

30.     The OSN response to the Daunte Wright protests included deployment of State Troopers, State Conservation Officers, and Hennepin County Sheriff's Deputies, among others.  Booking, processing, and detention of protesters at the Hennepin County Jail was performed by Hennepin County Sheriff's Deputies.  As discussed below, all these agencies and their employees and agents conspired together to violate the constitutional rights of Plaintiffs and the Plaintiff Class.

31.     During the Daunte Wright protests, Defendant Hutchinson had operational command of the law enforcement officers at the scene as part of the OSN function.  The Brooklyn Center Police Department and Hennepin County Sheriff's Office shared primary jurisdiction over the protest area, but because the Brooklyn Center Police Chief resigned after Wright's killing, Sheriff Hutchinson effectively had command over law enforcement at the scene.  Specifically, on April 13, Brooklyn Center made a request through the Hennepin County Chiefs of Police Association for the Hennepin County Sheriff's Office to take the lead role in incident command at the protests, and that night the HCSO and Hutchinson assumed command of the law enforcement response to the protests under a unified command structure.

32.     As the on-site commander directing the response to the protesters, Hutchinson was aware of unlawful arrest and detention of protesters and directly participated in planning and executing the constitutional violations detailed herein.  Moreover, Hutchinson did nothing to quell the law enforcement misconduct and instead ratified it in an ongoing failure of supervision that enabled the copious constitutional violations identified herein.

33.     The Minnesota State Patrol and State Conservation Officers operated under the supervision of Commissioner Harrington and Colonel Langer during the Daunte Wright protests, even though Sheriff Hutchinson served as the on-site commander.  Defendants Harrington and Langer were aware of the unconstitutional conduct at those protests engaged in by Hennepin County Sheriff's Deputies, State Troopers and State Conservation Officers.

## DEFENDANTS' UNCONSTITUTIONAL ACTS

34.     As the Daunte Wright protests began to build in size, on information and belief Defendants conspired to plan and execute an unconstitutional scheme to jail (and thereby silence) protesters and punish protesters for exercising their First Amendment rights, in the hope that by silencing and intimidating enough protesters the protests would dissipate.

35.     During the protests, State Troopers and Sheriff's Deputies intermittently and without warning took potshots at protesters, including Plaintiffs and the Plaintiff Class, with 40mm less-lethal weapons.  This unnecessary and unconstitutional use of force against peaceful protesters threatened to and did injure multiple individuals, including several journalists.

36.     Defendants knew that indiscriminate use of 40mm less-lethal weapons could seriously injure and potentially kill protesters.  Multiple individuals had been blinded or otherwise severely injured by such weapons during the protests following the murder of George Floyd in the summer of 2020, which Defendants knew.  Defendants Harrington and Langer, for example, had been named in several lawsuits related to the unlawful and

unconstitutional use of force, including injuries from 40mm weapons, during the George Floyd protests.

37.     On April 13, 2021, around 9:20 p.m., Plaintiff Kaplan and other members of the Plaintiff Class, numbering several dozen, were clustered in a group facing a line of hundreds of State Troopers and State Conservation Officers clad in riot gear and armed with tear gas, flash bang grenades, batons, and 40mm "less-lethal" weapons.  The protesters clustered peacefully behind umbrellas, chanting and otherwise engaging in peaceful First Amendment expression.   Plaintiffs and the Plaintiff Class were not looting, rioting, engaged in arson, engaged in violence, or violating a curfew.   Nonetheless, Defendants periodically and without warning fired less-lethal munitions and tear gas into the crowd of peaceful protesters.  The entire episode was captured on video by independent media outlet Unicorn Riot.[2]

38.     State Troopers and State Conservation Officers, without any provocation other than the mere presence of the protesters, eventually encircled the protesters, including Plaintiff Kaplan and other members of the Plaintiff Class, and arrested them.   The mass arrest occurred at roughly 9:30 p.m. – 30 minutes before the Brooklyn Center curfew was to go into effect.

39.     Protesters were ziptied and brought individually to patrol vehicles for processing by State Troopers and State Conservation Officers.  The patrol vehicles had

---

[2] https://unicornriot.ninja/livearchive/#gkit-popup

been lined up to serve as mobile booking stations to effectuate Defendants' premeditated plan to arrest, detain, and unlawfully jail peaceful protesters.

40.    Protesters' property was seized during processing and apparently brought to the State Patrol facility in Golden Valley.

41.    Arrested individuals, including Plaintiff Kaplan and other members of the Plaintiff Class, were held in the patrol vehicles while their arrests were electronically processed by State Troopers.  During this processing, State Troopers apparently created fraudulent statements of probable cause used to unlawfully detain protesters at the Hennepin County Jail.

42.    In one widely publicized arrest on April 13, State Troopers threw CNN producer Carolyn Sung to the ground, zip-tied and arrested her while she was covering the Daunte Wright protests, mistakenly believing Sung was a protester despite her repeated statements that she was a member of the press.

43.    After arresting Ms. Sung, State Troopers prepared a knowingly false "Statement of Probable Cause to Detain" to justify their arrest and transport of Ms. Sung to the Hennepin County Jail for prolonged detention.  This false report prepared by the State Patrol stated that Sung had "defied several dispersal orders," was "actively defiant" to State Troopers, "refused to leave the area," and "participated in vandalizing and rioting activity."  State Troopers concocted these lies about Ms. Sung to justify her unlawful detention and cover up their own misconduct.

44.    The HSCO held Sung in custody until attorneys for CNN secured her release by directly contacting high-level officials in Minnesota state government.[3]  Had Sung been a protester, without the privilege and access available to a CNN journalist, she would no doubt have been thrown into a holding cell and subjected to prolonged detention like Plaintiffs and the Plaintiff Class, pursuant to Defendants' conspiracy.

45.    On information and belief, Defendants prepared fraudulent and perjured statements of probable cause with respect to Plaintiffs and the Plaintiff Class similar to the fraudulent statement prepared with respect to Sung, even though Plaintiffs and the Plaintiff Class were engaged in peaceful protest or other lawful conduct, and Defendants knew probable cause for riot charges did not exist.

46.    On information and belief, Defendants prepared these fraudulent statements of probable cause because they knew that, under Minnesota law, they could not lawfully detain Plaintiffs and the Plaintiff Class overnight at the Hennepin County Jail absent probable cause that the detainee had committed a gross misdemeanor or felony.  Presence at an Unlawful Assembly and curfew violation are misdemeanors.  Riot can be charged as a gross misdemeanor or felony, sufficient to justify detention at the jail for 36 hours or more.

47.    After being processed in the patrol vehicles, protesters were brought to buses for transport to the Hennepin County Jail for further processing.  Protesters remained ziptied.  Many protesters had been ziptied behind their backs and suffered from being

---

[3] https://www.cnn.com/2021/04/19/media/minnesota-protests-coverage-reliable-sources/index.html

ziptied too tightly, were losing circulation, and some had their hands become discolored due to lack of circulation. Complaints to State Troopers regarding the circulation issues were ignored.

48.     Protesters sat on the buses for several hours before being ultimately transported to the Hennepin County Jail.

49.     Protesters continued to sit on the buses, ziptied, for hours after arriving at the Hennepin County Jail. The heat became unbearable on the buses. Some individuals became sick and vomited. Protesters tried to help those suffering the most by helping other protesters take off their shoes and socks, and by fanning those who were experiencing heat distress. Others had residual tear gas and pepper spray dripping into their eyes but could not brush it away as their hands remained ziptied behind their backs. Again, protesters on the bus tried to help these individuals. Law enforcement did nothing to help those who were suffering.

50.     Finally, after waiting for hours in the hot buses, protesters were allowed to exit one by one. Protesters prioritized exits for those suffering the most and needing medical attention. Once off the bus, the zipties were removed and protesters were handcuffed. HCSO deputies then moved the protesters to holding cells for processing into the jail. Despite the COVID risk, protesters received only a flimsy surgical mask before being crammed tightly into holding cells.

51.     Protesters were patted down, fingerprinted, photographed, put through a body-scanning machine, and provided orange jumpsuits to wear. Protesters were required to record themselves speaking a script into the jail phone so that the jail's voice recognition

software could recognize their voices and possibly record and transcribe phone calls. Protesters had their mugshots taken.

52.     Protesters were then placed in intake cells.  The cells were filthy and cold. They had a metal bench, a toilet/sink, and nothing else.  Plaintiff Kaplan was placed in a 6x9 cell with garbage on the floor and in the sink, and feces smeared on the walls.  Plaintiff Kaplan remained in this intake cell for roughly 12 hours before being moved to a housing cell.  Most of the female protesters were crammed tightly in one intake cell- roughly 20 protesters in all – despite the risk of COVID transmission.

53.     Even though they had been up all night getting processed into the jail, the protesters were not allowed to sleep.  Instead, one by one, they were summoned to participate in another intake interview ostensibly to acquire information to be presented to the Court during a bail hearing, though Defendants knew none of the Plaintiffs or members of the Plaintiff Class would be held long enough to require a bail hearing.  During this interview, protesters were asked to disclose personal information including their place of work and its location, among other information.  Protesters were informed they had been booked on allegations of felony riot.

54.     At this point, the protesters had been in custody for almost 8 hours and had received no food.  Additional jail staff visited protesters in their cells and asked questions about protesters' physical and mental health, medications, sexuality, and other highly personal information, including whether protesters "had a tendency or history of lashing out sexually."  Protesters were required to provide a COVID spit test by the jail nurse.

55.     Again, Plaintiff Class members had been in custody for hours with no food or sleep.  Breakfast – a granola bar– was not served until 9 a.m., roughly 12 hours after Plaintiffs Kaplan, Flom, and the other protesters had been arrested.  The jail intake processing and constant interruptions effectively deprived protesters of any sleep on the night of April 13.

56.     Protesters were finally moved out of intake and into housing cells late in the afternoon of April 14, more than 16 hours after being arrested.

57.     Defendants detained the protesters jailed on April 13 for more than 24 hours before releasing them uncharged.  Some Plaintiff Class Members – including Plaintiffs Kaplan and Flom – were detained in excess of 36 hours.

58.     On information and belief, the mass arrest and prolonged detention of protesters on April 13, 2021 was the product of a premeditated plan by Defendants to violate the First Amendment rights of the protesters.  The "Ops Plan" distributed by Defendants around 5:30 p.m. that night detailed a plan to move protesters to the strip mall one block from Brooklyn Center Police headquarters and then effectuate a mass arrest of protesters.  This "Ops Plan" stated plainly, many hours before the protests even occurred: "Goal is mass arrest.  Main event = strip mall parking lot."  Defendants briefed State Troopers and Conservation Officers regarding this plan at their pre-protest briefing on April 13, 2021.

59.     Defendants effectuated the same unconstitutional scheme of prolonged detention again on April 14 and April 16.  Like those arrested on April 13, April 14 and April 16 protesters were subject to unnecessary force, including use of less-lethal weapons,

ziptied, arrested, held on transport buses for hours, booked into the Hennepin County Jail on fraudulent statements of probable cause riot, and held overnight and longer, all in direct contravention of their constitutional rights.

60.     On information and belief, over 100 Plaintiff Class members were subjected to unlawful uses of force, arrest, and prolonged detention pursuant to fraudulent statements of probable cause between April 13-16.

61.     The trauma of the excessive force, arrest process, the heat, lack of sleep, lack of food, isolation, disgusting jail conditions, news that they were being charged with riot, and uncertainty about their situation generated substantial anxiety and emotional distress among the protesters, including among Plaintiffs and the Plaintiff Class.

62.     On information and belief, Defendants had planned for and did in fact jail Plaintiffs and the Plaintiff Class up until (and in some instances past) the expiration of the statutory maximum 36-hour hold of those individuals, after which the individuals needed to be charged and appear before a judge pursuant to Minn. R. Crim. P. 4.

63.     Minnesota law provides: "In misdemeanor cases, peace officers who decide to proceed with prosecution and who act without a warrant must issue a citation and release the defendant unless it reasonably appears: (1) the person must be detained to prevent bodily injury to that person or another; (2) further criminal conduct will occur; or (3) a substantial likelihood exists that the person will not respond to a citation." Minn. R. Crim. P. 6.01, subd. 1(a).

64.     Minnesota law further provides: "When an officer brings a person arrested without a warrant for a misdemeanor to a police station or county jail, the officer in charge of the police station, sheriff in charge of the jail, or officer designated by the sheriff must issue a

citation and release the person unless it reasonably appears to the officer that any of the circumstances in subdivision 1(a)(1)-(3) exist." Minn. R. Crim. P. 6.01, subd. 1(b).

65.    Minnesota law further provides: "A citation must be issued for petty misdemeanors and misdemeanors not punishable by incarceration. If an arrest has been made, a citation must be issued in lieu of continued detention." Minn. R. Crim. P. 6.01, subd. 1(c).

66.    The 36-plus hours that Defendants detained Plaintiffs and the Plaintiff Class far exceeded the period of detention necessary to accomplish the administrative steps incident to arrest and citation for a misdemeanor.

67.    Defendants knew that Plaintiffs and the Plaintiff Class were peaceful protesters and that detaining them for more than 24 hours was entirely punitive and retaliatory and utterly disconnected from any reasonable law enforcement or public safety rationale.

68.    But Defendants also knew that nothing would be more effective in curtailing the First Amendment expression of Plaintiffs and the Plaintiff Class than prolonged detention that kept those individuals locked up and unable to participate in additional protests, and which intimidated them from participating in future protests.

69.    Defendants were aware that under Minn. R. Crim. P. 6.01 they could not lawfully subject Plaintiffs and the Plaintiff Class to prolonged detention based only on misdemeanor curfew and unlawful assembly violations.

70.    Thus, to further their conspiracy to violate the constitutional rights of Plaintiffs and the Plaintiff Class, on information and belief Defendants created and swore to dozens of perjured statements of probable cause riot that could be used to justify prolonged detention of

Plaintiffs and the Plaintiff Class at Hennepin County Jail in violation of Minnesota law and the Constitution.

71.     While all Plaintiffs and members of the Plaintiff Class were detained on purported probable cause of commission of riot, on information and belief not one of these individuals have been charged with riot.  Instead, they have been charged with presence at an unlawful assembly or curfew violation, which are misdemeanors.  In some cases, even these misdemeanor charges have been dismissed prior to arraignment.

72.     The nearly uniform arrest of hundreds of protesters on purported probable cause riot to justify their prolonged detention, followed by the apparently uniform criminal complaints charging these protesters only with misdemeanor presence at unlawful assembly, evinces a premeditated scheme to violate the constitutional rights of Plaintiffs and the Plaintiff Class.

73.     Moreover, the nearly uniform use of probable cause riot to detain protesters on April 13, 14, and 16 does not reflect individualized determinations of probable cause by the arresting officers but rather a predetermined probable cause designation unconnected to any actual observations of the arrested protesters' conduct.

74.     This apparently premeditated scheme constitutes Defendants' official policy, or custom and practice, of violating the First Amendment rights of Plaintiffs and the Plaintiff Class.

75.     On information and belief, not a single Deputy, State Trooper or Conservation Officer has been disciplined for the unconstitutional conduct described herein.

76.     Defendants' supervisory officers knew of, sanctioned, and in some cases directed the unconstitutional conduct described herein.   For example, the apparent widespread, uniform, and coordinated use of false probable cause statements to subject Plaintiffs and the Plaintiff Class to prolonged jail detention demonstrates that Defendants' senior command not only knew of this unconstitutional conduct but actually planned, sanctioned, and directed it.

77.     Moreover, Defendants' use of force against Plaintiffs and the Plaintiff Class was directed and coordinated by Defendants' supervisory officers.   To the extent that individual officers used excessive force against Plaintiffs and the Plaintiff Class, the repeated incidents of excessive force, including the repeated unnecessary use of 40mm less-lethal weapons, reflects a failure by Defendants' supervisory officers to intervene and end the unconstitutional conduct.

78.     For example, video during the protests shows Hennepin County Sheriff's Deputies and other of Defendants' agents randomly firing 40mm less-lethal weapons and other crowd control munitions at protesters through the chain-link fence surrounding the Brooklyn Center police station, even though the protesters are at least 20 feet from the fence, huddled behind umbrellas, protesting loudly but peacefully.[4]

79.     Defendants perpetuated their scheme during the midst of the COVID pandemic, unnecessarily endangering the unlawfully arrested individuals by housing them in large groups at jail despite not knowing the COVID status of these individuals.   Trooper,

---

[4] *See, e.g.,* https://www.youtube.com/watch?v=-skk3Mkr3Cs at 43:00-45:00.

guard and inmate mask use was lax during the arrest and detention.  Not surprisingly, some members of the Plaintiff Class contracted COVID while being detained at the jail.

80.     Defendants published personal information of Plaintiffs and the Plaintiff Class on the internet, including their home addresses, enabling right-wing social media accounts to publicize that information and dox Plaintiffs and the Plaintiff Class.  For example, the right-wing Twitter account "AntifaWatch" disseminated the names, ages, photographs, and other personal information of Plaintiffs and members of the Plaintiff Class after obtaining that information from the HCSO website.

81.     AntifaWatch has more than 41,000 followers on Twitter.  The doxxed individuals included Plaintiffs Kaplan, Flom, Hassan and other members of the Plaintiff Class.[5]  The release of their personal information led to threats of violence online.  One twitter account – @kill_socialists – posted a response to Plaintiffs' doxxed information on Twitter, threatening: "Getting their socials and addresses.   Going to torture them." Additional information, including mugshots of Plaintiffs and the Plaintiff Class, freely and now perpetually available via simple Google search, was posted to the AntifaWatch website.[6]

82.     Similarly, right-wing personality Andy Ngo posted the mugshots and personal information of Plaintiffs and the Plaintiff Class to his twitter account, which has

---

[5] *See, e.g.,* https://twitter.com/AntifaWatch2/status/1382357343443226627
[6] https://antifawatch.net/ViewReport/e6c22a1e

more than 956,0000 followers.[7]  The tweet identifying Plaintiff Kaplan was retweeted more than 1,000 times.

83.    The information contained on the AntifaWatch website alleging Plaintiffs and the Plaintiff Class were rioters – as opposed to peaceful protesters – is defamatory. But because AntifaWatch derived all this information from the Defendants' publication, Plaintiffs and the Plaintiff Class have no recourse against AntifaWatch and other similar organizations permanently smearing Plaintiffs and the Plaintiff Class online.

84.    Defendants' publication of false accusations against Plaintiffs has irreparably damaged them.  For example, the third item that shows up in a Google search for the terms Zoe, Kaplan, and Minnesota, is Plaintiff Kaplan's mugshot and Defendants' riot allegation as curated by the Antifa Watch website.  Any future employer or other person conducting online research of Plaintiff Kaplan will be exposed to this information, regardless of any expungement – all thanks to Defendants' unconstitutional conduct.  Other members of the Plaintiff Class are similarly harmed by the perpetual online availability of this misinformation.

85.    Defendants' unconstitutional motive for Plaintiffs' arrest and detention – to retaliate against peaceful protesters and effectively prevent them from further speech by keeping them jailed – was the driving force behind Defendants' unnecessary force, arrest, fraudulent statements, and prolonged and unlawful detention of Plaintiffs and the Plaintiff Class in violation of the First, Fourth, and Fourteenth Amendments.

---

[7] https://twitter.com/mrandyngo/status/1384816938493284356

86.     Defendants' unlawful detention of Plaintiffs and the Plaintiff Class also constitutes the tort of false imprisonment under Minnesota law.

87.     Moreover, Defendants did not even have probable cause to arrest Plaintiffs and the Plaintiff Class for presence at an unlawful assembly.

88.     Minn. Stat. 609.715 provides that a person commits the misdemeanor crime of presence at an unlawful assembly, if that person "without lawful purpose is present at the place of an unlawful assembly and refuses to leave when so directed by a law enforcement officer."

89.     As detailed below, Plaintiffs were present in Brooklyn Center with a lawful purpose.  Moreover, Plaintiffs Flom and Hassan – and other members of the Plaintiff Class – were actively trying to leave the protest scene when they were assaulted and arrested by Defendants.

## THE NAMED PLAINTIFFS

A.     **NAMED-PLAINTIFF ZOE KAPLAN.**

90.     Plaintiff Kaplan was arrested on the night of April 13, 2021.  Kaplan had initially attended the protest to provide dinner to protesters early in the evening but remained at the protest after distributing dinner.  At the time of the arrests on April 13, Kaplan was in the front line of a group of individuals crouching behind umbrellas to protect themselves from the less-lethal weapons being fired by Defendants.  Kaplan was not rioting, looting, vandalizing, or engaged in violence, nor were those around Kaplan engaged in such activity.  The April 13 curfew had not yet gone into effect.

91.    Even though Kaplan was engaged in peaceful protest, a State Trooper arrested them and, on information and belief, perjured himself in a statement of probable cause claiming that Kaplan had been rioting to effectuate Kaplan's detention, all pursuant to Defendants' premeditated unconstitutional scheme to harass, intimidate, and suppress the First Amendment expression of Kaplan and other members of the Plaintiff Class.

92.    Despite the risk of COVID transmission, at least some State Troopers and State Conservation Officers remained unmasked while processing protesters' arrests in the enclosed patrol vehicles.  For example, Kaplan's arresting trooper did not wear a mask while processing their arrest.  Kaplan witnessed another protester ask his arresting trooper to wear a mask, but the trooper ignored this request.

93.    Kaplan was detained and jailed for approximately 40 hours – they were arrested at approximately 9:30 p.m. on April 13 and released from jail at approximately 1:00 p.m. on April 15.  Kaplan was not charged prior to their release, never appeared before a judge, no bail was assessed, and no conditions of release were imposed against them.

94.    Kaplan was ultimately charged with presence at an unlawful assembly.  The Complaint against Kaplan alleges: "At approximately 9:35 p.m., Trooper Dingman was in the area of Humboldt Avenue N and 67th Avenue N in Brooklyn Center.  The trooper observed and made contact with an individual who laid down on the ground and failed to leave the area after the assembly was declared unlawful and multiple disperse [sic] orders were announced.  The individual was identified as ZOE ASHER KAPLAN, the defendant herein.  The defendant was detained for being present at and refusing to depart the unlawful assembly."

23

95.     Conspicuously absent from the Complaint against Kaplan is any mention of riotous behavior by Kaplan or that Kaplan was arrested, detained and jailed for approximately 40 hours.

96.     During the approximately 40 hours Defendants wrongfully detained and jailed Kaplan, they were stuck for more than four hours on a stiflingly hot bus while ziptied, forced to spend 12 more hours in a small filthy, feces-smeared cell, repeatedly exposed to COVID-19, provided no food for 12 hours and then denied a request for a kosher meal and presented a bologna sandwich instead, repeatedly searched and patted down, asked invasive, personal questions, required to provide Defendants with a voice recognition sample, and harassed, intimidated, debased and insulted by Defendants' agents and employees.

97.     Defendants' misconduct toward Kaplan was part of a premeditated, calculated, retaliatory strategy to harass, detain, intimidate and chill the First Amendment expression of Plaintiffs and the Plaintiff Class, including Kaplan.

98.     The misconduct of Defendants and their agents and employees, including the HCSO deputies who processed, harassed, and wrongfully jailed Kaplan, and the State Troopers who arrested Kaplan and, on information and belief, lied about Kaplan's conduct in a sworn statement of probable cause, reflects Defendants' failure to adequately train and supervise their agents and employees, and Defendants' deliberate choice to ignore the unconstitutional conduct of their agents and employees.

**B.      NAMED PLAINTIFF JACK FLOM**

99.    Plaintiff Flom is a student at the University of Minnesota majoring in political science and urban studies.

100.    On the evening of April 13, 2021, Plaintiff Flom and a friend drove to the Daunte Wright protests occurring in Brooklyn Center.  Plaintiff Flom expected that protesters would need rides home from the protest, and he drove to Brooklyn Center to provide rides.  Flom was driving his own car, a red Honda CRV.

101.    Plaintiff Flom and his friend arrived at the protests at roughly 9:30-10:00 p.m. and parked their car at Van's Automotive at 69th and Humboldt.  They began walking toward the protests near the Brooklyn Center Police station.

102.    Flom and his friend had been present at the protests for just a few minutes when the crowd began running toward them.  Flom and his friend began running away from the protest area as well, back to their car.

103.    To the extent dispersal orders had been given prior to Flom's arrest, he was not present for those dispersal orders and did not hear them.

104.    Flom jumped into his car and started it.  Two individuals previously unknown to Flom jumped into his back seat – freelance photojournalist Chris Tuite and New York Times journalist Joshua McFadden.  Flom tried to pull out of the parking lot, but two State Troopers stepped in front of his vehicle and pointed their weapons at him through the car windshield.  They screamed at Flom: "GET OUT OF THE FUCKING CAR!"  At this moment, other State Troopers opened the driver's side door and the car's back doors.  The troopers struck McFadden with their wooden riot batons, destroying his camera.  They

pulled Tuite and McFadden from the vehicle, even though they were yelling that they were members of the press.  Troopers also reached in and grabbed Flom, pulled him from the driver's seat, and threw him to the ground with such force that his leg was bruised and his glasses broken.

105.   In sworn testimony about this incident, Tuite explained that State Patrol faced off with a line of peaceful protesters for roughly 90 minutes before effectuating mass arrests, including the arrest of Flom:

> . . . I believe that [the State Patrol] wanted to clear the area, but they waited a long time.  It was an hour, hour and a half.  It was essentially protesters expressing their displeasure verbally to the line of officers.  It stayed fine.  A small fire was started in the street, essentially like a campfire shape with some pieces of wood.  The second after that happened, all the troopers started rushing, running after people, and chased everyone down, including cars.

*Goyette, et al. v. City of Minneapolis, et al.*, 20-CV-1302 (DKT 203, July 28, 2021, Hr'g Tr. at 101-103).

106.   Video taken by Unicorn Riot in the moments before Flom's arrest shows cars and individuals on foot leaving the scene of the protests, then several marked and unmarked law enforcement vehicles blocking the street so cars could not leave the area, and State Troopers pulling individuals from cars to arrest them.[8]  No individuals are rioting, looting, or engaged in arson. Instead, video shows protesters peacefully leaving the scene on foot

---

[8] https://www.youtube.com/watch?v=BIQP0qEmOW8

and in their vehicles.  At 1:42:21 in the Unicorn Riot video, Flom's CRV can be seen idling in the Van's Automotive parking lot.

107.   Troopers ziptied Flom, and a trooper brought him to a patrol vehicle, where he was processed and, on information and belief, the arresting trooper prepared a fraudulent statement of probable cause claiming that Flom had been engaged in riotous activity, knowing that no such probable cause existed.  Again, the purpose of this false statement of probable cause was to effectuate Defendants' scheme to detain peaceful protesters, including Flom, to retaliate against and punish them for their First Amendment expression, to intimidate and chill protesters from further protest, and to effectively remove protesters from the street for 36+ hours to reduce the number of individuals protesting at the Brooklyn Center Police Department.

108.   Flom was taken to a transport bus, where he sat, ziptied, for several hours, and was then transported to the Hennepin County Jail.

109.   Like Kaplan, Flom was processed into the jail – booked, fingerprinted, photographed multiple times, forced to surrender his personal belongings, searched, patted down, put in an orange jumpsuit, required to answer personal questions about his physical and mental health, and required to provide a voice recognition sample in order to use the phone.  Jail staff harassed and insulted Flom.

110.   Flom was housed, alone, in a solitary confinement cell.  Flom was only allowed out of his cell for 1 hour per day.

111.   Flom takes anti-anxiety medication.  He requested that deputies obtain the medication for him, but they refused to provide it (or any of his medications), which pushed

27

Flom to the brink of a mental health crisis. The mental health trauma Flom suffered during his detention affects him to this day.

112.   Like Kaplan, Flom was doxxed by a number of right-wing activists on social media. His booking photograph, a photograph culled from his social media accounts, and the allegation he participated in a riot, remain publicly available on the "AntifaWatch" website.

113.   Hennepin County held Flom for 40 hours before releasing him, an unreasonable period of prolonged detention, far longer than the period necessary to cite, identify and release him on the misdemeanor charge of presence at an unlawful assembly, and one far beyond the term authorized by law.

114.   The criminal complaint against Flom states: "At approximately 10:45 p.m., Trooper Mains was in the area of Humboldt Ave. and 70th Street, when he observed a grey Honda SUV that failed to leave the area after the multiple announcements of an unlawful assembly. Trooper Mains approached the driver and made contact with an individual identified as Jack Nickolaus Flom. The individual was detained as a result of the curfew and for being present at and refusing to depart the unlawful assembly."

115.   Conspicuously absent from the criminal complaint against Flom is any mention of riotous behavior by Flom or that Flom was arrested, detained and jailed for approximately 40 hours.

116.   In May 2021, Flom was denied housing after a background check revealed he had been arrested and charged in connection with his brief presence at the Daunte Wright protests.

C.     **NAMED PLAINTIFF SAMIRA HASSAN**

117.    Plaintiff Hassan participated in peaceful protests in Brooklyn Center during the early evening on April 14.  Hassan had driven her 16-year-old brother to the protests. They lost contact, and as the curfew hour neared, Hassan decided to leave the protests and return home to Saint Paul.  She could not locate her brother and ultimately assumed he had found another way home.

118.    Halfway home, Hassan's brother sent her a text message asking her to come pick him up.  She turned around and returned to Brooklyn Center to get him.

119.    Hassan parked near the address her brother had given her and quickly located him.  A large force of State Troopers and State Conservation Officers loomed nearby in riot gear, though they were not arresting anyone, announcing an unlawful assembly, or using less-lethal weapons or tear gas on the scattered protesters.

120.    As Hassan and her brother were leaving the protests, they were stopped by a reporter who asked them about their thoughts on racial justice and reason for protesting. Hassan spoke to the reporter for several minutes, on camera.

121.    A cadre of State Troopers stood roughly 20 feet away, watching Hassan intently as she spoke to the reporter.  Hassan noticed that the troopers were watching her speak with the reporter, which made her nervous as she feared retaliation for talking to the press.

122.    Video taken by Unicorn Riot confirms that immediately prior to Plaintiff Hassan's arrest, she and her minor brother were speaking to the press, that few protesters were milling about in the area, with a gaggle of press nearby, it was quiet, and there was

no rioting, looting, vandalizing, or violence occurring.[9]   Video shows State Troopers, including a Captain, watching and listening intently from about 20 feet away as Plaintiff Hassan, wearing a bathrobe, speaks to the press.  Her brother is simply quietly looking at his phone during Plaintiff Hassan's interview.

123.   As the Unicorn Riot video shows, immediately after Hassan concluded her interview with the press, State Troopers tackled her brother and pushed him face-first into the dirt.  Hassan began to yell in protest of her brother's arrest, at which point a Trooper stated, "take her too," and she was tackled and pushed face-first into the dirt just like her brother.  Troopers kneeled on Hassan's back and legs and ziptied her hands behind her back.  Other Troopers surrounded Plaintiff Hassan and the arresting officers to obscure the arrest and prevent the media from filming it.  Dozens of additional troopers then moved in and physically forced press out of the area.  Again, as the video shows, there is not even any organized protesting going on, let alone rioting, vandalizing, looting, or violence.

124.   There was no legitimate law enforcement reason for State Troopers to tackle and violently arrest Hassan and her brother, and the force used in her arrest was unreasonable.

125.   Hassan and her brother were arrested and separated from each other.  Hassan feared for her brother, a minor, and asked repeatedly what had happened to him and where law enforcement was taking him, but the troopers ignored her requests for information.

---

[9] *See* https://www.youtube.com/watch?v=-skk3Mkr3Cs at 2:10-2:15.

126.   Hassan sat on the transport bus, hands ziptied behind her back, with dozens of other protesters for over an hour.  After arriving at the Hennepin County jail, Hassan was photographed, fingerprinted and put in a cell.  Protesters were told they would be in jail for several nights.  Officers were rude and mocked the protesters.  The jail was freezing cold, and Hassan asked for a blanket and socks but was denied both.  Hassan was released from jail after having been detained roughly 24 hours.

127.   The criminal complaint against Hassan states: "At approximately 10:00 p.m., Trooper Bowe was in the area of Humboldt and 67th when he observed and made contact with an individual who failed to leave the area after the assembly was declared unlawful and multiple dispersal orders were announced.  . . . The Defendant was detained for violation of the city-wide curfew and refusing to depart the unlawful assembly."

128.   Video shows, however, that the allegations in the Complaint are patently false.  Hassan was given no order to disperse before her arrest.  Moreover, the Complaint makes no mention of Hassan's participation in any riot, nor does it allege any facts that would suggest probable cause existed to arrest and detain Hassan on a riot charge.  Of course, no such facts exist, as the video of the incident makes clear and as Defendants knew full well when they arrested Plaintiff Hassan and her minor brother, and jailed Hassan for 24 hours, all in violation of the Constitution.

## MUNICIPAL ALLEGATIONS

129.   Minnesota Department of Public Safety Commissioner John Harrington, Minnesota Department of Resources Commissioner Sarah Strommen, Minnesota State Patrol Colonel Matthew Langer, and Hennepin County Sheriff David Hutchinson, in their

official capacities ("the State and Municipal Defendants"), each have established policies, practices, and/or customs of violating the constitutional rights of members of protesters, including Plaintiffs and the Plaintiff Class, or have been deliberately indifferent to such constitutional violations by their officers, agents, and employees, as described herein.

130.   The State and Municipal Defendants had an official policy to arrest and unlawfully detain protesters on false claims of probable cause riot to intimidate protesters and keep them jailed and physically unable to protest, as demonstrated by the dozens of such arrests and detentions, repeated night after night at the Daunte Wright protests.

131.   Alternatively, the unlawful seizure, use of force, and prolonged detention of protesters constituted State and Municipal Defendants' unofficial custom and practice, and the continuing, widespread, and persistent pattern of this misconduct, over multiple days of protests, stretching across hundreds of incidents of unreasonable use of force, unconstitutional arrest and detention as described herein, and which on information and belief included widespread false reports submitted under oath, was so pervasive as to effectively have the force of law.

132.   The State and Municipal Defendants have been deliberately indifferent to the unconstitutional use of force, wrongful arrest and prolonged detention of hundreds of protesters, and the apparent use of false pretenses in official reports and sworn statements to excuse this unconstitutional conduct.

133.   The State and Municipal Defendants had a custom, practice, or policy of using less-than-lethal force, without warning and without time for disbursement, on citizens who are not resisting arrest and who are exercising First Amendment rights.

134.   The State and Municipal Defendants had a policy, practice, or custom of targeting protesters with objectively unreasonable excessive force, such as firing less-lethal projectiles and tear gas while at close range and with no legitimate law enforcement purpose.

135.   For example, video of the Daunte Wright protests shows dozens of incidents, on multiple nights, in which the employees and agents of the State and Municipal Defendants fired less-lethal weapons and chemical agents at protesters for no legitimate law enforcement purpose, without warning and time for disbursement, injuring protesters including members of the Plaintiff Class.

136.   Video also shows multiple incidents of arrest, across the several nights of protest, wherein non-resisting individuals are thrown to the ground or otherwise subjected to unnecessary force in the effectuation of their arrest.   This includes Plaintiffs Flom, Kaplan, and Hassan, who as described above suffered from unnecessary use of force during their arrest – in Flom's case, bruising him and breaking his glasses.

137.   These dozens and dozens of unnecessary and unreasonable uses of force by the State and Municipal Defendants, across multiple nights of protest, visited upon individuals peacefully exercising their First Amendment rights, constitute a continuing, widespread, and persistent pattern of unconstitutional conduct, which was so pervasive as to effectively have the force of law.

138.   Alternatively, this widespread unnecessary use of force on peaceful protesters at the Daunte Wright protests reflects the official policy of State and Municipal Defendants.

139.    On information and belief, the State and Municipal Defendants have not disciplined a single employee, officer, or agent for the constitutional violations identified herein, or for any constitutional violation arising out of the George Floyd and Daunte Wright protests.

140.    The State and Municipal Defendants were on notice of the unconstitutional conduct.  The OSN system of inter-agency communication and unified command ensured that all Defendants knew of the widespread constitutional violations described herein.  The fact that the heads of each agency participated in nightly news conferences to provide after-action reports on each evening's protests and the law enforcement response evidences their communication and awareness of law enforcement conduct at the protests.

141.    The State and Municipal Defendants' failure to intervene and end the misconduct of their employees and agents, and in fact to ratify it, and State and Municipal Defendants' continuing failure to discipline any officers involved in the misconduct, demonstrates State and Municipal Defendants' deliberate indifference to that misconduct and deliberate choice to ignore the constitutional violations alleged herein.

142.    The State and Municipal Defendants are fully cognizant of the constitutional rights they are failing to protect.

## CLASS ALLEGATIONS

143.    Under Rules 23(a) and 23(b)(1) and (2) of the Federal Rules of Civil Procedure, Plaintiffs bring this action for prospective relief on behalf of themselves and other similarly situated people who were arrested during the Daunte Wright protests and held unconstitutionally at the Hennepin County Jail (the "Plaintiff Class"). The Plaintiff

Class is defined as: protesters in Brooklyn Center, Minnesota, seized during the Daunte Wright protests, April 11, 2021 and April 18, 2021, and subjected to detention lasting at least 4 hours based on false allegations of riot.

144.    The Plaintiff Class is so numerous that joinder of all the members would be impracticable.

145.    As a result of Defendants' customs and policies of arresting protesters, including subjecting them to the unnecessary use of force, detaining them for riot despite the lack of probable cause, and denying them freedom of movement to engage in constitutionally protected First Amendment activity, the Plaintiff Class have been and will continue to be deprived of their constitutional rights under the First, Fourth, and Fourteenth Amendments.

146.    Plaintiffs' claims for prospective relief are typical of the members of the Plaintiff Class because protests are ongoing, and Plaintiffs and the Plaintiff Class members have a reasonable fear that Defendants will continue to carry out the unconstitutional customs or policies described herein.

147.    Plaintiffs will fairly and adequately protect the interests of the Plaintiff Class. Plaintiffs have no conflicts involving other class members or Defendants.  Plaintiffs understand their role as class representatives and their duties to the class in this litigation. Plaintiffs are represented by competent and skilled counsel whose interests are fully aligned with the interests of the class.

148.    Questions of law or fact are common to the class.  These legal and factual questions include but are not limited to:

a.     Does the unlawful seizure and prolonged detention of protesters through a common scheme violate the First, Fourth, and Fourteenth Amendments?

b.     Are the Defendants liable for implementing an unlawful policy or custom as set forth under principles of municipal liability?

c.     Have the Defendants manifested a failure to properly train and supervise their agents and officers?

d.     Have the Defendants exhibited a reckless and deliberate indifference to the unconstitutional conduct alleged herein?

149.   Maintaining individual actions would create a risk of "inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class." Fed. R. Civ. P. 23(b)(1)(A). Multiple courts issuing multiple injunctions would be entirely untenable. Doing so would only contribute to a state of uncertainty and confusion that allows the constitutional violations described in this Complaint to continue.

150.   This case involves "adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications." Fed. R. Civ. P. 23(b)(1)(A). A ruling with respect to a single Plaintiff in this case would arguably be strong stare decisis—if not necessarily res judicata—with respect to other putative class members and members of the law enforcement community. There is no benefit to allowing the overwhelmingly common issues in this case to be litigated individually. The interests of both class members and defendants requires class-wide treatment.

151.    Finally, "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole[.]" Fed. R. Civ. P. 23(b). There is no allegation that Plaintiffs have been targeted because of anything unique to them as individuals. Rather, they have been repeatedly targeted because of their common exercise of their First Amendment rights.  Plaintiffs' targeting exists only by virtue of a broader pattern and practice of unconstitutional conduct directed at protesters as a class. Logically, injunctive relief for the "class as a whole" is the only mechanism available to afford relief in light of conduct directed specifically to the class.

## CAUSES OF ACTION

### COUNT I:
### FIRST AMENDMENT—FREE SPEECH, FREE ASSEMBLY, 42 U.S.C. § 1983

152.    Plaintiffs and the Plaintiff Class restate and reallege all previous paragraphs of this Complaint.

153.    Plaintiffs and the Plaintiff Class engaged in constitutionally protected acts of public protest, demonstration, and assembly during the Daunte Wright protests from April 13-17.

154.    Plaintiffs and Plaintiff Class members were not under arrest or displaying probable cause sufficient for an arrest when they were subjected to excessive force in retaliation for exercising their First Amendment rights.

155.    Defendants, at all times acting under color of law, used unlawful use of force, and unlawful arrest and detention, to curb Plaintiffs' and the Plaintiff Class's exercise of their First Amendment rights.

156.    The actions of Defendants were willful, malicious and in violation of the known rights of Plaintiffs and the Plaintiff Class.

157.    Alternatively, Defendants acted with reckless and deliberate indifference to the constitutional rights of Plaintiffs and the Plaintiff Class.

158.    Plaintiffs and the Plaintiff Class reasonably fear the continued deployment of chemical agents without warning, unlawful seizure, and excessive force through the firing of flash bang grenades, less-lethal projectiles, riot batons, and other means, as well as unlawful arrest, prolonged detention, and jailing, if they continue to engage in constitutionally protected activity.

159.    These acts would chill a reasonable person from continuing to engage in constitutionally protected activity. These acts did, in fact, chill Plaintiffs and the Plaintiff Class from continuing to protest on matters of public interest.

160.    It was the Defendants' custom and policy, as well as their failure to train and supervise their officers, and issue corrective instructions after violations were brought to light, which caused Defendants to violate the First Amendment rights of Plaintiffs and the Plaintiff Class.

161.    The State and Municipal Defendants' failure to supervise and train their employees and agents with respect to the First Amendment rights of Plaintiffs and the Plaintiff Class, including a failure to investigate and discipline officers for First

Amendment violations, amounts to reckless and deliberate indifference to the rights of Plaintiffs and the Plaintiff Class.

162.   The pattern of similar constitutional violations against Plaintiffs and the Plaintiff Class that occurred during the Daunte Wright protests, and the apparently premeditated nature of these violations and Defendants' unconstitutional scheme to detain and jail Plaintiffs and the Plaintiff Class, demonstrates the reckless and deliberate indifference of the Defendants to the rights of Plaintiffs and the Plaintiff Class.

163.   Given the multiple constitutional violations documented above, the need for more supervision or training was so obvious, and the inadequacy of the training and supervision so likely to result in the violation of constitutional rights, that the Defendants demonstrated their reckless and deliberate indifference to the need for such training and supervision.

164.   Further, the excessive and unlawful use of force, and the rampant constitutional violations, were so widespread, well-known, and obvious to Defendants, that Defendants' continued use of excessive force against Plaintiffs and the Plaintiff Class, and unlawful arrest, detention and jailing of Plaintiffs and the Plaintiff Class, was willful and recklessly indifferent to the rights of Plaintiffs and the Plaintiff Class.

165.   Plaintiff Kaplan's First Amendment rights were violated when they were targeted with tear gas and less-lethal munitions, and when they were wrongfully arrested, detained, and jailed based on a knowingly false statement of probable cause made under oath, all because of Kaplan's exercise of their First Amendment right to protest the police killing of Daunte Wright.

166.   Plaintiff Flom's First Amendment rights were violated when Defendants aimed weapons at him; forced him to stop his car; pulled him forcefully from his car; violently threw Flom to the ground, bruising him and breaking his glasses; ziptied him; held him on a transport bus for several hours; delivered him to the Hennepin County Jail; booked, processed, fingerprinted, photographed, searched, handcuffed, and jailed Flom at the Hennepin County Jail for riot without probable cause; required Flom to provide a voice recognition sample; confiscated and inspected Flom's property; and denied Flom access to his prescription medication, all because of Flom's exercise of his First Amendment right to participate in and demonstrate solidarity with the Daunte Wright protests by providing volunteer rides home to other protesters.

167.   Plaintiff Hassan's First Amendment rights were violated when Defendants used force to terminate her freedom of movement; ziptied and arrested her; held her on a transport bus for several hours; delivered her to the Hennepin County Jail; booked, processed, fingerprinted, photographed, searched, handcuffed, and jailed her at the Hennepin County Jail for riot without probable cause; required her to provide a voice recognition sample; and confiscated and inspected her property, all because of Hassan's exercise of her First Amendment rights to participate, however briefly, in the protests by speaking with a reporter and by criticizing law enforcement's unlawful arrest of her brother, who was himself at the time exercising his First Amendment rights.

168.   Plaintiffs suffered physical injury and emotional trauma and distress as a direct and proximate result of Defendants' violations of their constitutional rights.

169.   Punitive damages in an amount to be determined by the jury are available against Defendants and are hereby claimed as a matter of federal common law under *Smith v. Wade*, 461 U.S. 30 (1983), and as such, are not subject to the pleading requirements or the differing standard of proof set forth in Minn. Stat. § 549.20.

170.   Defendants are jointly and severally liable to Plaintiffs and the Plaintiff Class.

## COUNT II:
## FIRST AMENDMENT—RETALIATION, 42 U.S.C. § 1983

171.   Plaintiffs and the Plaintiff Class restate and reallege all previous paragraphs of this Complaint.

172.   Plaintiffs and the Plaintiff Class engaged in constitutionally protected acts of protest, speech and expression.  Plaintiffs and the Plaintiff Class will continue to do so in the future.

173.   Defendants retaliated against Plaintiffs and the Plaintiff Class for engaging in constitutionally protected activity.  Defendants' retaliation is part of a custom or practice of unconstitutional conduct that is certain to continue absent any relief.

174.   Defendants' retaliation included the use of less-lethal weapons and chemical weapons against peaceful protesters, including Plaintiffs and the Plaintiff Class, for no legitimate law enforcement reason, as well as a scheme to harass, arrest and unlawfully detain peaceful protesters, including Plaintiffs and the Plaintiff Class, on false allegations of probable cause riot.

175.    The actions of Defendants were willful, malicious and in violation of the known rights of Plaintiffs and the Plaintiff Class.

176.    Alternatively, Defendants acted with reckless and deliberate indifference to the constitutional rights of Plaintiffs and the Plaintiff Class.

177.    Plaintiffs and the Plaintiff Class reasonably fear the continued deployment of chemical agents without warning, unlawful seizure, and excessive force through the firing of flash bang grenades, less-lethal projectiles, riot batons, and other means, as well as unlawful arrest, detention, and jailing, if they continue to engage in constitutionally protected activity.

178.    These acts would chill a person of reasonable firmness from continuing to engage in a constitutionally protected activity. These acts did, in fact, chill Plaintiffs and the Plaintiff Class from continuing to engage in constitutionally protected demonstrations.

179.    It was the Defendants' custom and policy, as well as their failure to train and supervise their officers, and issue corrective instructions after violations were brought to light, which caused the First Amendment retaliation.

180.    The Defendants' failure to supervise and train their employees and agents with respect to the First Amendment rights of Plaintiffs and the Plaintiff Class, including a failure to investigate and discipline officers for First Amendment retaliation, amounts to reckless and deliberate indifference to the rights of Plaintiffs and the Plaintiff Class.

181.    The pattern of similar constitutional violations against Plaintiffs and the Plaintiff Class demonstrates the reckless and deliberate indifference of the State, County and Municipal Defendants to the rights of Plaintiffs and the Plaintiff Class.

182.    Further, the excessive and unlawful use of force, and the rampant constitutional violations, were so widespread, well-known, and obvious to Defendants, that Defendants' continued use of excessive force to retaliate against Plaintiffs and the Plaintiff Class, and continued retaliatory violation of constitutional rights, was willful and recklessly indifferent to the rights of Plaintiffs and the Plaintiff Class.

183.    Plaintiffs suffered physical injury and emotional distress as a direct and proximate result of Defendants' violations of their constitutional rights.

184.    Punitive damages in an amount to be determined by the jury are available against Defendants and are hereby claimed as a matter of federal common law under *Smith v. Wade*, 461 U.S. 30 (1983), and as such, are not subject to the pleading requirements or the differing standard of proof set forth in Minn. Stat. § 549.20.

185.    Plaintiffs and the Plaintiff Class reasonably fear further retaliation in the future if they continue to observe, record, or participate in constitutionally protected activity.

186.    Plaintiffs' and the Plaintiff Class's fear of future retaliation establishes an ongoing and continuous injury by chilling their exercise of their First Amendment rights, which will not be remedied by any alleged policy changes voluntarily undertaken by the State and Municipal Defendants.

187.    Defendants are jointly and severally liable to Plaintiffs and the Plaintiff Class.

## COUNT III:
## FOURTH AMENDMENT—UNLAWFUL SEIZURE AND UNREASONABLE FORCE, 42 U.S.C. § 1983

188.    Plaintiffs and the Plaintiff Class restate and reallege all previous paragraphs of this Complaint.

189.    Plaintiffs and the Plaintiff Class were seized by Defendants when their officers intentionally, through the unreasonable use of force, chemical agents, and less-lethal projectiles, terminated Plaintiffs and the Plaintiff Class's freedom of movement.

190.    Defendants were acting under color of law when they violated the Fourth Amendment rights of Plaintiffs and the Plaintiff Class.

191.    Plaintiffs and the Plaintiff Class were also seized by Defendants when they were arrested and detained.

192.    The mugshot photographing of Plaintiff Class members also constituted an unlawful seizure under the Fourth Amendment.

193.    The actions of Defendants were willful, malicious and in violation of the known rights of Plaintiffs and the Plaintiff Class.

194.    Alternatively, Defendants acted with reckless and deliberate indifference to the constitutional rights of Plaintiffs and the Plaintiff Class.

195.    Plaintiff Flom's Fourth Amendment rights were violated when Defendants aimed weapons at him; forced him to stop his car; pulled him forcefully from his car; violently threw Flom to the ground, bruising him and breaking his glasses; ziptied him; held him on a transport bus for several hours; delivered him to the Hennepin County Jail; booked, processed, fingerprinted, photographed, searched, handcuffed, and jailed Flom at the

Hennepin County Jail for riot without probable cause; required Flom to provide a voice recognition sample; confiscated and inspected Flom's property; and denied Flom access to his prescription medication. The unnecessary and prolonged detention of Flom pursuant to his arrest extended far beyond the time necessary to identify Flom and cite him for presence at an unlawful assembly.

196.   Further, given that Plaintiff Flom was peacefully trying to leave the scene of the protests, and transporting two journalists at the time, his seizure was unreasonable under the Fourth Amendment.

197.   Plaintiff Kaplan's Fourth Amendment rights were violated when Defendants used force to terminate their freedom of movement; ziptied them; held them on a transport bus for several hours; delivered them to the Hennepin County Jail; booked, processed, fingerprinted, photographed, searched, handcuffed, and jailed them at the Hennepin County Jail for riot without probable cause; required them to provide a voice recognition sample; and confiscated and inspected their property. The unnecessary and prolonged detention of Kaplan pursuant to their arrest extended far beyond the time necessary to identify them and cite them for presence at an unlawful assembly.

198.   Given that Plaintiff Kaplan was peacefully protesting at the time of their arrest, and that they were among a group of other individuals peacefully protesting, in a defensive posture to protect themselves from random and potentially injurious potshots from less-lethal weapons fired by State Troopers, and not in violation of any curfew, their seizure was unreasonable under the Fourth Amendment.

199.    Plaintiff Hassan's Fourth Amendment rights were violated when Defendants used force to terminate her freedom of movement; ziptied and arrested her; held her on a transport bus for several hours; delivered her to the Hennepin County Jail; booked, processed, fingerprinted, photographed, searched, handcuffed, and jailed her at the Hennepin County Jail for riot without probable cause; required her to provide a voice recognition sample; and confiscated and inspected her property.  The unnecessary and prolonged detention of Hassan pursuant to her arrest extended far beyond the time necessary to identify her and cite her for presence at an unlawful assembly.

200.    Given that Plaintiff Hassan was simply picking her brother up from the protest at the time of her arrest, was not present with an unlawful purpose, and had not been ordered to leave by the State Troopers that ambushed and tackled her as she and her brother were making their way to her car, her seizure was unreasonable under the Fourth Amendment.

201.    Defendants committed these acts without forewarning and, as a result, Defendants' acts were objectively unreasonable and constituted unlawful seizure and excessive force.

202.    Plaintiffs and the Plaintiff Class did not pose a threat to any of Defendants' officers or agents or any other person.

203.    Plaintiffs and the Plaintiff Class were not rioting, looting, engaged in arson, or engaged in violence when Defendants used force to terminate their freedom of movement; ziptied and arrested them; held them on a transport bus for several hours; delivered them to the Hennepin County Jail; booked, processed, fingerprinted,

photographed, searched, handcuffed, and jailed them at the Hennepin County Jail for riot without probable cause; required them to provide a voice recognition sample; and confiscated and inspected their property, all in violation of the Fourth Amendment.

204.    It was the Defendants' custom and policy, as well as their failure to train and supervise their officers, and issue corrective instructions after violations were brought to light, which caused the unlawful seizures.

205.    The Defendants' failure to supervise and train their employees and agents with respect to the Fourth Amendment rights of Plaintiffs and the Plaintiff Class, including a failure to investigate and discipline officers for Fourth Amendment violations, amounts to reckless and deliberate indifference to the rights of Plaintiffs and the Plaintiff Class.

206.    Further, the excessive and unlawful use of force, and the rampant constitutional violations, were so widespread, well-known, and obvious to Defendants, that Defendants' continued use of excessive force against Plaintiffs and the Plaintiff Class, and continued violation of constitutional rights, and failure to supervise, discipline, or correct these violations was willful and recklessly indifferent to the rights of Plaintiffs and the Plaintiff class.

207.    As a direct and proximate result of Defendants' violations of Plaintiffs' constitutional rights, Plaintiffs have suffered physical injury. Plaintiffs suffered physical injury and emotional distress as a direct and proximate result of Defendants' violations of their constitutional rights.

208.    Punitive damages in an amount to be determined by the jury are available against Defendants and are hereby claimed as a matter of federal common law under *Smith*

*v. Wade*, 461 U.S. 30 (1983), and as such, are not subject to the pleading requirements or the differing standard of proof set forth in Minn. Stat. § 549.20.

209.    Plaintiffs and the Plaintiff Class reasonably fear further violation of the Fourth Amendment if they continue to observe, record, or participate in constitutionally protected activity.

210.    Defendants are jointly and severally liable to Plaintiffs and the Plaintiff Class.

## COUNT IV:
## FOURTEENTH AMENDMENT—DUE PROCESS, 42 U.S.C. § 1983

211.    Plaintiffs and the Plaintiff Class restate and reallege all previous paragraphs of this Complaint.

212.    The Due Process rights of Plaintiffs and the Plaintiff Class were violated when the Defendants, through their officers and agents, arrested and jailed members of the Plaintiff Class without probable cause.

213.    The Due Process rights of Plaintiffs and the Plaintiff Class were violated when Defendants subjected them to prolonged detention beyond the term authorized by law.

214.    The actions of Defendants were willful, malicious and in violation of the known rights of Plaintiffs and the Plaintiff Class.

215.    Alternatively, Defendants acted with reckless and deliberate indifference to the constitutional rights of Plaintiffs and the Plaintiff Class.

216.   It was the Defendants' custom and policy, as well as their failure to train and supervise their officers, and issue corrective instructions after violations were brought to light, which caused the Due Process violations.

217.   The Defendants' failure to supervise and train their employees and agents with respect to the Due Process rights of Plaintiffs and the Plaintiff Class, including a failure to investigate and discipline officers for Due Process violations, amounts to reckless and deliberate indifference to the rights of Plaintiffs and the Plaintiff Class.

218.   The pattern of similar constitutional violations against Plaintiffs and the Plaintiff Class that occurred during the Daunte Wright protests demonstrates the reckless and deliberate indifference of the State, County and Municipal Defendants to the rights of Plaintiffs and the Plaintiff Class.

219.   Defendants violated the Fourteenth Amendment rights of Plaintiffs and the Plaintiff Class by issuing unlawful dispersal orders at the Daunte Wright protests.

220.   Defendants violated the Due Process rights of Plaintiffs and the Plaintiff Class when they filed sworn statements of probable cause stating Plaintiffs and the Plaintiff Class had engaged in rioting when Defendants knew those sworn statements were false.

221.   Plaintiffs suffered physical injury and emotional distress as a direct and proximate result of Defendants' violations of their constitutional rights.

222.   Punitive damages in an amount to be determined by the jury are available against Defendants and are hereby claimed as a matter of federal common law under *Smith v. Wade*, 461 U.S. 30 (1983), and as such, are not subject to the pleading requirements or the differing standard of proof set forth in Minn. Stat. § 549.20.

223.    Plaintiffs and the Plaintiff Class reasonably fear further violation of the right to due process in the future if they observe, record, or participate in constitutionally protected activity.

224.    Defendants are jointly and severally liable to Plaintiffs and the Plaintiff Class.

## COUNT V:
## CIVIL CONSPIRACY, 42 U.S.C. § 1983

225.    Plaintiffs and the Plaintiff Class restate and reallege all previous paragraphs of this Complaint.

226.    Defendants conspired, under color of law, to deprive Plaintiffs and the Plaintiff Class of their constitutional rights.

227.    Defendants conspired to target Plaintiffs and the Plaintiff Class because of their exercise of First Amendment rights, to interfere with and retaliate against the Plaintiffs' and the Plaintiff Class's exercise of their constitutional rights.

228.    Defendants coordinated with one another prior to and during the Daunte Wright protests regarding their response to the protests and the scheme of arresting and jailing individuals on probable cause riot.

229.    Defendants acted in concert with one another in violating the constitutional rights of Plaintiffs and the Plaintiff Class.

230.    As described above, Defendants engaged in overt acts in furtherance of their conspiracy to violate the constitutional rights of Plaintiffs and the Plaintiff Class, and these overt acts injured Plaintiffs and the Plaintiff Class.

231.    The actions of Defendants were willful, malicious and in violation of the known rights of Plaintiffs and the Plaintiff Class.

232.    Alternatively, Defendants acted with reckless and deliberate indifference to the constitutional rights of Plaintiffs and the Plaintiff Class.

233.    Plaintiffs and the Plaintiff Class reasonably fear Defendants will continue to conspire to violate the constitutional rights of Plaintiffs and the Plaintiff Class.

## COUNT VI:
## FAILURE TO INTERVENE, 42 U.S.C. § 1983

234.    Plaintiffs and the Plaintiff Class restate and reallege all previous paragraphs of this Complaint.

235.    During the constitutional violations described in this Complaint, Defendants, including but not limited to John Doe supervisors and commanders in the Hennepin County Sheriff's Department, and Minnesota State Patrol, Colonel Langer, Sheriff Hutchinson, and Commissioner Harrington, stood by without intervening to prevent the misconduct.

236.    Defendants had a duty to intervene to prevent the constitutional harms and personal injuries described in this Complaint.

237.    Defendants had the authority to intervene to prevent the constitutional harms and personal injuries described in this Complaint.

238.    Defendants had a reasonable opportunity to prevent the constitutional harms and personal injuries described in this Complaint but failed to do so.

239.   Defendants acted with reckless and deliberate indifference to the constitutional rights of Plaintiffs and the Plaintiff Class when they failed to intervene to prevent the constitutional harms and personal injuries described in this Complaint.

240.   The misconduct described in this Complaint was undertaken under color of state law, and Defendants acted at all times under the color of state law when they failed to intervene to prevent the constitutional harms and personal injuries described in this Complaint.

## COUNT VII:
## FALSE IMPRISONMENT

241.   Plaintiffs and the Plaintiff Class restate and reallege all previous paragraphs of this Complaint.

242.   All acts of the individual Defendants alleged above were conducted within the scope of the Defendants' employment or duties.

243.   The actions of Defendants were willful, malicious and in violation of the known rights of Plaintiff.

244.   Defendants detained and jailed Plaintiffs and the Plaintiff Class longer than they would have been detained absent Defendants' unconstitutional policy of asserting fraudulent statements of probable cause riot against Plaintiffs and Plaintiff Class to effectuate their prolonged detention.

245.   Defendants intentionally confined Plaintiffs and the Plaintiff Class beyond the time permitted by law, and Plaintiffs and the Plaintiff Class did not consent to this unlawful detention.

246.    Defendants knew they had no lawful authority to arrest Plaintiffs and the Plaintiff Class, nor to continue detaining Plaintiffs and the Plaintiff Class.

247.    Defendants knew they did not have sufficient probable cause or authority under Minnesota law, or the Constitution, to continue to keep Plaintiffs and the Plaintiff Class members in jail after their arrest.

248.    Defendants thus either knew that the arrest and prolonged detention of Plaintiffs and the Plaintiff Class created a high probability of injury to the rights of Plaintiffs and the Plaintiff Class or, at minimum, intentionally disregarded facts creating a high probability of injury to the rights of Plaintiffs and the Plaintiff Class.

249.    Nonetheless, Defendants deliberately proceeded to act in conscious disregard of the high degree of probability of injury to the rights of Plaintiffs and the Plaintiff Class under Minnesota law and the Constitution, by subjecting Plaintiffs and the Plaintiff Class to prolonged detention based on false allegations of riot.

250.    As a direct and proximate result of this false imprisonment, Plaintiffs and the Plaintiff Class suffered injuries and damages, in an amount in excess of $75,000.00 exclusive of interests and costs, together with legal fees as authorized by law.

251.    Plaintiffs and the Plaintiff Class are also entitled to punitive damages against Defendants under Minnesota Statutes section 549.20.

252.    Defendants are both directly and vicariously liable for the false imprisonment of Plaintiffs and the Plaintiff Class.

253.    Defendants are jointly and severally liable to Plaintiffs and the Plaintiff Class.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and as representatives of the class defined

herein, pray for relief as follows:

A.      A determination that this action may proceed as a class action under Rule
        23(b)(1) or 23(b)(2) of the Federal Rules of Civil Procedure;

B.      Designation of Plaintiffs as Class Representatives and designation of
        Plaintiffs' counsel as class counsel;

C.      A declaration that Defendants' conduct violated the First, Fourth, and
        Fourteenth Amendments of the U.S. Constitution;

D.      A permanent injunction barring the unlawful use of force, detention and
        jailing of protesters at future protests:

E.      Damages compensating Plaintiffs for their injuries, including but not limited
        to compensatory, pecuniary, and medical expense damages;

F.      Punitive damages;

G.      An award of pre-judgment interest;

H.      An award of attorneys' fees and costs pursuant to 42 U.S.C. § 1988;

I.      An award of such other and further relief as the Court deems equitable and
        just.

## **JURY DEMAND**

Plaintiffs demand a trial by jury of all issues triable pursuant to Rule 38 of the

Federal Rules of Civil Procedure.

Dated: March 10, 2022          */s/ Kevin C. Riach*
                                          Kevin C. Riach (#0389277)
                                          **THE LAW OFFICE OF KEVIN C. RIACH, PLLC**
                                          P.O. Box 270815
                                          Vadnais Heights, MN 55127
                                          Telephone: (612) 203-8555
                                          kevin@riachdefense.com

                                          ***ATTORNEY FOR PLAINTIFFS***