**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

| | |
|---|---|
| Zoe Kaplan, Jack Flom, and Samira Hassan, *on behalf of themselves and other similarly situated individuals*, | Civil No. 22-0640 (JRT/JFD) |
| Plaintiffs, | |
| v. | **MEMORANDUM AND ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS** |
| Minnesota Department of Public Safety Commissioner John Harrington, *in his individual and official capacity*; Minnesota Department of Natural Resources Commissioner Sarah Strommen, *in her individual and official capacity;* Minnesota State Patrol Colonel Matthew Langer, *in his individual and official capacity*, Hennepin County Sheriff David Hutchinson, *in his individual and official capacity*; John Does 1-10, *in their individual and official capacities,* | |
| Defendants. | |

---

Kevin C. Riach, **THE LAW OFFICE OF KEVIN C. RIACH**, P.O. Box 270815, Vadnais Heights, MN 55127, for Plaintiffs.

Alexander Hsu, Joseph D. Weiner, **OFFICE OF THE MINNESOTA ATTORNEY GENERAL**, 445 Minnesota Street, Suite 1100, Saint Paul, MN 55101, for Defendants John Harrington and Matthew Langer.

Oliver J. Larson, Peter J. Farrell, **OFFICE OF THE MINNESOTA ATTORNEY GENERAL**, 445 Minnesota Street, Suite 1400, Saint Paul, MN 55101, for Defendant Sarah Strommen.

Devona L. Wells and Sarah C. S. McLaren, **HENNEPIN COUNTY ATTORNEY'S OFFICE**, 300 South Sixth Street, Suite A2000, Minneapolis, MN 55487, for Defendant David Hutchinson.

Plaintiffs Zoe Kaplan, Jack Flom, and Samira Hassan allege they were peacefully protesting the killing of Daunte Wright outside the Brooklyn Center City Hall when John Doe Defendants used excessive force, arrested them, and held them in violation of their federal constitutional and state rights. Plaintiffs purport to represent a class of protesters who experienced similar treatment. Plaintiffs allege that former Commissioner John Harrington, Commissioner Sarah Strommen, Colonel Matthew Langer, and former Sheriff David Hutchinson, conspired to retaliate against them for exercising their First Amendment rights. Commissioner Harrington, Commissioner Strommen, and Colonel Langer (the "State Defendants") moved to dismiss the claims against them for lack of subject matter jurisdiction, and all Defendants moved to dismiss for failure to plead any plausible theories of liability.

The Court finds that Plaintiffs have standing to sue the State Defendants for injunctive relief and therefore the Court has subject matter jurisdiction. However, the Court will dismiss all official capacity claims against State Defendants and Hutchinson because they are based on the theories of civil conspiracy and retaliation, and the Court concludes that Plaintiffs have not plausibly pled either that Defendants conspired to violate protesters' rights, or that Defendants acted with ill will towards protesters. For

the same reasons, the Court will dismiss the civil conspiracy and retaliation claims against all Defendants in their individual capacity.

The Court also will dismiss the claims against Commissioner Strommen in her individual capacity because Plaintiffs do not plausibly plead her involvement—or that of any DNR officer—in the alleged offenses.

As to whether Commissioner Harrington, Colonel Langer, or Sheriff Hutchinson may be held individually liable for the alleged First Amendment, Fourth Amendment, and excessive detention claims, the Court will conclude that Plaintiffs do not plausibly plead that any named Defendant was on notice of a pattern of misconduct such that they failed to train—or to supervise—any John Doe Defendant. The Court will also dismiss the failure to intervene claims because Plaintiffs fail to plead that Defendants had an opportunity to intervene in any instance of excessive use of force, and the false arrest claims because none of the named Defendants arrested the named Plaintiffs. The individual capacity claims against Hutchinson will be dismissed without prejudice because Plaintiffs may be able to allege sufficient facts in the case against the former Sheriff since he was present during the protests. Finally, the Court will dismiss without prejudice all claims against John Doe Defendants because Plaintiffs have not identified them, and Plaintiffs have not pled sufficient detail at this time to identify them with limited discovery.

## BACKGROUND

### I.    FACTS

On April 11, 2021, Daunte Wright was shot and killed by Kimberly Potter, a 26-year police veteran.  Wright's death sparked large protests against police use of force.  This case arises from the law enforcement response to these protests, which took place primarily outside of the police department headquarters at Brooklyn Center City Hall. (Compl. ¶ 15, Mar. 10, 2022, Docket No. 1.)  Plaintiffs Zoe Kaplan, Jack Flom, and Samira Hassan allege they were peaceful participants at these protests between April 13 and April 14, 2021.  (*Id.* ¶¶ 1–3.)

The Defendants are former Minnesota Department of Public Safety Commissioner John Harrington, Minnesota Department of Natural Resources Commissioner Sarah Strommen, Minnesota State Patrol Colonel Matthew Langer, former Hennepin County Sheriff David Hutchinson, and John Doe agents of the Minnesota State Patrol, Minnesota Department of Natural Resources, and Hennepin County Sheriff's Office.  (*Id.* ¶¶ 4–8.)  All Defendants were sued in both their individual and official capacities.  Plaintiffs argue that Defendants, by and through their corresponding agencies, used excessive force, arrested them, and held them in violation of their federal constitutional and state rights.  (*Id.*)

### A.    Law Enforcement Response

In response to the protests, Governor Tim Walz issued an Emergency Executive Order on April 12, declaring a peacetime state of emergency in seven Minnesota counties and authorizing federal, state, and local agencies to respond to the emergency.  (Decl.

Sarah McLaren ("McLaren Decl."), Ex. 4, Docket No. 16-4.)   Governor Walz ordered a curfew in four metro-area counties, including Hennepin County, starting at 7:00 p.m. on April 12 until 6:00 a.m. on April 13.  (Compl. ¶ 18.)  City-wide curfews were also ordered on April 13, 14, and 16 in Brooklyn Center.  (*Id.* ¶¶ 19–21.)  Defendants' corresponding agencies provided much of the law enforcement resources in response to the protests. (*Id.* ¶ 16.)  After law enforcement arrested protesters, Hennepin County sheriff's deputies booked, processed, and detained protesters at the Hennepin County jail.  (*Id*. ¶ 59.)  The agencies coordinated this response through Operation Safety Net ("OSN"), which was an unincorporated association of law enforcement agencies that had been assembled to conduct crowd control operations during the murder trial of Derek Chauvin, which was ongoing during the protests of the murder of Daunte Wright.  (*Id.* ¶ 22.)  Plaintiffs allege that OSN members acted in concert with one another during the protests and that OSN "operated as a vehicle by which the Defendants conspired to and did violate Plaintiffs' constitutional rights."  (*Id.* ¶ 27.)

Soon after the death of Mr. Wright, the Brooklyn Center Police Chief resigned.  (*Id.* ¶ 31.)  Defendant Hutchinson assumed operational command of the law enforcement officers at the scene.  (*Id*.)  He was also physically present at the protests and acted as the on-site commander.  (*Id.* ¶ 32.)

### B.    Zoe Kaplan's Arrest

Plaintiff Zoe Kaplan[1] alleges that around 9:20 p.m. on April 13, 2021, they and several dozen other members of the putative class were clustered in a group facing a line of state troopers and state conservation officers when the Defendants "periodically and without warning fired less-lethal munitions and tear gas into the crowd of peaceful protesters." (*Id.* ¶ 37.)  The Complaint alleges that Kaplan and the other protesters were not looting, rioting, engaged in arson, violating curfew, or otherwise engaging in violence, but Kaplan acknowledges that a fire was started by someone.  (*Id.* ¶¶ 37, 105.)  The state troopers and state conservation officers then encircled the protesters and conducted mass arrests.  (*Id.* ¶ 38.)

Kaplan's and the other protesters' arrests were captured on video by Unicorn Riot, which is an independent media outlet. [2]  (*Id.* ¶ 37.)  The video footage shows some of the events that preceded Kaplan's arrest.[3]  The video shows that officers ordered the crowd to vacate to the north and for media to leave the area.  (McLaren Decl. Ex. 2, at 00:02:17–00:02:25, 00:02:52–00:02:58.)[4]  Moments later, some type of munition was deployed

---

[1] Kaplan uses they/them pronouns.

[2] *See* Unicorn Riot, *Daunte Wright Protests: Day 3 - Brooklyn Center, MN,* YouTube (Apr. 13, 2021), https://www.youtube.com/watch?v=BIQP0qEmOW8.

[3] The video footage was referenced by Plaintiffs in their Complaint and the parties do not dispute the video's authenticity.  Therefore, the Court may properly consider it along with the Complaint.  *Herron v. E.W. Scripps Co.*, 776 F. App'x 929, 930 n.2 (8th Cir. 2019) (citing *Ashanti v. City of Golden Valley*, 666 F.3d 1148, 1150–51 (8th Cir. 2012)).

[4] Available at https://www.youtube.com/watch?v=BIQP0qEmOW8.

either by law enforcement or an individual near the umbrellas wielding crowd.  (*Id.* at 00:02:38–00:02:42.)  The video shows law enforcement officers deploying gas cannisters in response to the munition and individuals kicking the cannisters back at law enforcement.  (*Id.* at 00:06:56–00:07:35, 00:11:57–00:12:10.)  The video also shows a fire that was started by protesters before the police moved to conduct mass arrests.  (*Id.* at 01:40:58.)

Kaplan and others were arrested at approximately 9:30 p.m. (Compl. ¶ 38.)  The criminal complaint against Kaplan states that a "trooper observed and made contact with an individual who laid down on the ground and failed to leave the area after the assembly was declared unlawful and multiple disperse [sic] orders were announced."  (*Id.* ¶ 94.)

Kaplan was detained and jailed for approximately 40 hours and was ultimately charged with presence at an unlawful assembly.  (Compl. ¶¶ 93–94.)

### C.    Jack Flom's Arrest

Plaintiff Jack Flom arrived at the protest roughly between 9:30–10:00 p.m. on April 13.  (Compl. ¶ 101.)  Flom alleges that a few minutes after arriving, the crowd began running towards Flom.  (*Id.* ¶ 102.)  The video shows that a separate vehicle had pulled up between the police officers and protesters, at which point law enforcement began to move towards the protesters and members of the crowd started screaming and running away from both the vehicle and law enforcement.  (McLaren Decl., Ex. 2, at 01:40:35–01:40:55.)  The video captures a fire on the street, but does not clearly indicate whether

the car, the fire, or some other incident, was why police began approaching the protesters.  (*Id.* at 01:40:30–01:42:00.)

The crowd running towards Flom prompted him to run back to his car, at which point two individuals, who happened to be journalists, jumped into his back seat.  (*Id.* ¶¶ 102–04.)  Flom alleges he tried to leave, but that state troopers stepped in front of his vehicle, pointed their weapons at him, and instructed him to get out of the car.  They then allegedly opened his car doors, pulled him out of the driver's seat, and threw him to the ground.  (Compl. ¶ 104.)  Flom alleges that the state troopers struck one of the journalists with their batons and destroyed his camera, and that they pulled the other from the vehicle despite identifying himself as a member of the press.  (*Id.*)  Flom suffered a bruised leg, and his glasses were broken.  (*Id.*)  He alleges that he did not hear any dispersal orders prior to these events.  (*Id.* ¶ 103.)

The criminal complaint against Flom states that the trooper "observed a grey Honda SUV that failed to leave the area after multiple announcements of an unlawful assembly" and that Flom "was detained as a result of the curfew and for being present at and refusing to depart the unlawful assembly."  (Compl. ¶ 114.)  Flom was transported to the Hennepin County jail, processed, fingerprinted, searched, and placed in solitary confinement.  (*Id.* ¶¶ 107–10.)

### D.  Samira Hassan's Arrest

Plaintiff Samira Hassan participated in the protests during the early evening of April 14 after driving her 16-year-old brother to the protests.  (*Id.* ¶ 117.)  Hassan alleges she

was leaving when she was approached by members of the press.  She was then interviewed on camera about her thoughts on the protests and racial justice issues, a moment that was caught on camera by Unicorn Riot.  (*Id*. ¶ 120; McLaren Decl. Ex. 3, at 02:10:39–02:11:08.)  She alleges that when she finished the interview, state troopers tackled her brother and pushed him face-first into the dirt. (Compl. ¶ 123.)  Hassan yelled at the state trooper in protest and was also tackled.  (*Id*.)  They were then both arrested and taken to the Hennepin County jail.  (*Id*. ¶¶ 125–26.)  The video does not capture what event (if any) caused Hassan's brother to be tackled.  (McLaren Decl. Ex. 3, at 02:13:00–02:13:52.)[5]  However, Ms. Hassan can be seen recording the event with her phone as she screams at the officers before being arrested herself.  (*Id.* at 02:13:34–02:13:45.)

The criminal complaint against Hassan states that at approximately 10:00 p.m., a trooper "observed and made contact with an individual who failed to leave the area after the assembly was declared unlawful and multiple dispersal orders were announced," and that she was "detained for violating the city-wide curfew and refusing to depart the unlawful assembly."  (Compl. ¶ 127.)

### E.    Probable Cause Statements

Under Minnesota law, the Defendants could not lawfully detain Plaintiffs without probable cause that they had committed a gross misdemeanor or felony.  (*Id.* ¶ 46.)  Plaintiffs allege that the state troopers knew that they were engaged in peaceful protest

---

[5] Available at https://www.youtube.com/watch?v=-skk3Mkr3Csat.

or other lawful conduct, but that Defendants created fraudulent statements of probable cause to justify their arrests and detention. (*Id.* ¶¶ 41, 46.)

In support of these allegations, Plaintiffs point to the arrest of a CNN producer who was mistakenly identified as a protester and arrested despite her repeated statements that she was a member of the press. (*Id.* ¶ 42.) Plaintiffs allege that state troopers knowingly prepared a false statement of probable cause to justify arresting her and that she was only released and not subjected to prolonged detention because CNN secured her release. (*Id.* ¶¶ 43–44.)

### F.    Detention

Plaintiffs allege that after being processed in patrol vehicles, their hands remained zip tied behind their backs. (*Id.* ¶ 47.) They were allegedly zip tied too tightly, which caused loss of circulation and discoloring, and state troopers ignored their complaints. (*Id.*) Plaintiffs also allege that they sat on buses for hours after arriving at the Hennepin County jail, that the heat was so unbearable that some individuals became sick and vomited, and that law enforcement did nothing to help those who were suffering. (*Id.* ¶ 48.) Putative class members were then placed in allegedly filthy and cold cells and Kaplan was specifically placed in a 6x9 cell with feces smeared on the walls. (*Id*. ¶ 52.) After being jailed and processed, Plaintiffs were informed they were booked on allegations of felony riot. (*Id.* ¶ 53.)

Protesters jailed on April 13 were held for more than 24 hours and some, including Kaplan and Flom, were detained more than 36 hours. (*Id.* ¶ 57.) Plaintiff Hassan was held for approximately 24 hours. (*Id.* ¶ 128.)

## II.    CLAIMS

### A.  Class Allegations

Plaintiffs seek to represent a putative class defined as: "protesters in Brooklyn Center, Minnesota, seized during the Daunte Wright Protests, April 11, 2021, and April 18, 2021, and subjected to detention lasting at least 4 hours on false allegations of riot." (*Id.* ¶ 143.)  Plaintiffs allege that members of the putative class were subjected to unnecessary use of force, that state troopers and sheriff's deputies took "potshots" at protesters using 40mm less-lethal weapons without warning, and that such use of force was unnecessary and unconstitutional as used against peaceful protesters and did injure multiple individuals. (*Id.* ¶ 35.)  Plaintiffs also allege that members of the putative class were detained without probable cause and denied the freedom to engage in First Amendment protected activities. (*Id.* ¶ 145.)

### B.    Conspiracy

Plaintiffs plead that the mass arrest and prolonged detention of protesters was a premeditated plan by Defendants to violate their First Amendment rights. (*Id.* ¶ 58.) Plaintiffs claim that Defendants distributed an "Ops Plan" before the protests, detailing a scheme to move protesters to the strip mall one block away from Brooklyn Center Police headquarters and conduct mass arrests. (*Id.* ¶ 58.)  Plaintiffs allege that the Ops Plan

-11-

stated, "Goal is mass arrest. Main event = strip mall parking lot." (*Id.*) Plaintiffs assert that the same scheme was used on April 14 and 16. They allege that more than 100 putative class members were subjected to unlawful use of force, arrests, and prolonged detentions based on law enforcement's fraudulent statements of probable cause. (*Id.* ¶¶ 59–60.)

Plaintiffs argue that the fact that none of them were charged with riot, despite there being purported probable cause to that effect, is evidence of premeditation. (*Id.* ¶ 71.) Plaintiffs argue that the named Defendants knew of and sanctioned the unconstitutional conduct because the use of allegedly false probable cause statements was widespread, uniform, and coordinated. (*Id.* ¶ 76.)

Plaintiffs further allege that Defendants have established policies, practices, and/or customs of violating the constitutional rights of protesters, or at least are deliberately indifferent to such constitutional violations by their officers, agents, and employees. (*Id.* ¶ 129.) Alternatively, Plaintiffs allege that the Defendants' practices constitute unofficial customs and practices that are so continuing, widespread, and persistent as to effectively have the force of law. (*Id.* ¶ 131.)

According to Plaintiffs, Defendant Hutchinson was the on-site commander directing the response to the protest. He was allegedly not only aware of the unlawful arrest and detentions, but also directly participated in the planning and execution of the response and ratified the misconduct and alleged constitutional violations by failing to

supervise the on-the-ground officers. (*Id.* ¶ 32.) Although Defendant Hutchinson served

as the on-site commander, Plaintiffs also allege that the Minnesota State Patrol and State

Conservation Officers operated under the supervision of Commissioner Harrington and

Colonel Langer, so they were also aware of the unconstitutional conduct at the protests.

(*Id.* ¶ 33.)

### III.    PROCEDURAL HISTORY

On March 10, 2022, Plaintiffs initiated this action alleging violations of their First

Amendment, Fourth Amendment, and Fourteenth Amendment rights, as well as claims

of civil conspiracy and failure to intervene under 42 U.S.C. § 1983, and a state common

law claim for false imprisonment.

In response, Defendants filed three separate motions to dismiss. (Mot. Dismiss

("Hutchinson Mot. Dismiss"), Docket No. 13; Mot. Dismiss ("Strommen Mot. Dismiss"),

Docket No. 19; Mot. Dismiss ("Harrington and Langer Mot. Dismiss"), Docket No. 25.) All

defendants move to dismiss under Rule 12(b)(6) and argue that Plaintiffs have not

plausibly pled any of their claims. (*Id.*) Defendants Harrington, Langer, and Strommen

also moved to dismiss under Rule 12(b)(1) for lack of subject matter jurisdiction.

(Strommen Mot. Dismiss; Harrington and Langer Mot. Dismiss.)

**DISCUSSION**

I.    **STANDARD OF REVIEW**

    **A.  Subject Matter Jurisdiction**

For a court to have subject matter jurisdiction, a claim must involve an actual case or controversy.  U.S. Const. Art. III, § 2, cl. 1.  The standing to sue doctrine is "rooted in the traditional understanding of a case or controversy."  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).  A plaintiff has standing to sue when the plaintiff (1) suffered an injury in fact; (2) the injury is "fairly traceable" to the defendant's actions; and (3) the injury is "likely to be redressed by a favorable decision."  *Id.*  To allege an injury in fact that confers standing to seek injunctive relief, a plaintiff "must show they are likely to suffer future injury that will be remedied by the relief sought."  *Elizabeth M. v. Montenez*, 458 F.3d 779, 784 (8th Cir. 2006).  The Court must address subject-matter jurisdiction before reaching a motion to dismiss.  *Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 94–95 (1998).

    **B.    Motion to Dismiss**

In reviewing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court considers all facts alleged in the complaint as true to determine if the complaint states a "claim to relief that is plausible on its face."  *Braden v. Wal-Mart Stores, Inc*., 588 F.3d 585, 594 (8th Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."

*Iqbal*, 556 U.S. at 678.  In reviewing a Rule 12(b)(6) motion to dismiss, the Court may consider the allegations in the complaint as well as "those materials that are necessarily embraced by the pleadings." *Schriener v. Quicken Loans, Inc.*, 774 F.3d 442, 444 (8th Cir. 2014).

Although the Court accepts the complaint's factual allegations as true and construes the complaint in a light most favorable to the plaintiff, the Court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286 (1986).  In other words, a complaint "does not need detailed factual allegations" but must include more "than labels and conclusions, and a formulaic recitation of the elements" to meet the plausibility standard.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

## II.   ANALYSIS

All of Plaintiffs' claims are against each Defendant in their official capacity and individual capacity.  However, the official capacity claims all arise from the same set of facts and allegations.  The Court will first address the official capacity claims before turning to the individual capacity claims.

### A.  Official Capacity Claims

Plaintiffs do not allege that any of the named Defendants personally used force, arrested, or detained them.  Instead, the only specific actions that Plaintiffs allege that the named Defendants took are formation of a civil conspiracy and the customs and policies of retaliation.  Therefore, all of Plaintiffs' official capacity claims rely on their

theories of civil conspiracy and retaliation, and if these two theories fail, all other official capacity claims fail. Because understanding these two theories requires first broadly discussing the nature of the suit at large, the Court will begin by discussing broader issues of this action and then address the theories in detail.

### 1. Standing

State Defendants argue the Court lacks subject matter jurisdiction because the Plaintiffs lack standing. Lawsuits against government employees in their official capacity are treated as claims against the government entity itself. *Kentucky v. Graham*, 473 U.S. 159, 165 (1985) ("[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity."). Accordingly, Plaintiffs effectively brought this action against the State of Minnesota and Hennepin County.

Generally, plaintiffs may not bring damage suits against a state government unless the state waives its Eleventh Amendment immunity from claims in federal court. *See generally Elizabeth M.*, 458 F.3d at 784. In contrast, plaintiffs may bring an action against a municipality, such as a county, if the plaintiffs allege injury resulting from the municipality's customs or policies. *See, e.g., Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 694 (1978).

Here, the parties agree that the State of Minnesota has not waived its Eleventh Amendment immunity. Therefore, Plaintiffs may not bring damage lawsuits against the State Defendants, Commissioner Harrington, Commissioner Strommen, or Colonel Langer. *See DeGidio v. Perpich*, 612 F. Supp. 1383, 1388–89 (D. Minn. 1985). However,

Plaintiffs may still bring prospective or injunctive relief suits against the State Defendants. *See Ex Parte Young*, 209 U.S. 123, 159–60 (1908).

Whether the Plaintiffs have subject matter jurisdiction turns on whether they have sufficiently pled that they are likely to suffer future injury that can be remedied by the relief sought. *See Elizabeth M.*, 458 F.3d at 784 (holding that plaintiffs must show they are likely to suffer future injury that will be remedied by the relief sought). The Court finds that plaintiffs have sufficiently pled the likelihood of future injury that could be remedied by injunctive relief because they pled their intent to participate at future protests. (Compl. ¶¶ 1–3.) If Plaintiffs intend to participate in future protests, they allege that they are likely to suffer future injury if law enforcement continues the alleged conspiracy.

State Defendants rely primarily on *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983), to argue that Plaintiffs have not sufficiently pled a likelihood of future injury. In *Lyons*, the Supreme Court ruled that Lyons had not sufficiently pled that he would be subject to illegal chokeholds in the future. *Lyons*, 461 U.S. at 103. The Court reiterated that "past wrongs do not in themselves amount to that real and immediate threat of injury necessary to make out a case or controversy." *Id.* But *Lyons* is distinguishable from this case because Lyons claimed he was likely to suffer future injury for engaging in illegal activity, specifically that he would be subject to a chokehold for committing future traffic

violations.  *Id.* at 105.  The Court determined this was speculative because it presumed that Lyons would follow the law in the future.  *Id.* at 102–103.

Lyons is inapplicable here because Plaintiffs allege their intention to engage in lawful First Amendment activity: protesting.  Additionally, in *Lyons*, the court explained that in order to establish an actual controversy, the claimant would have to allege that either (1) all officers engage in the illegal activity, or (2) that the City ordered or authorized police officers to act in such manner.  *Id.* 105–106.  This is precisely what Plaintiffs have alleged in this case.  They argue that officers on the ground were not only authorized to engage in illegal activity, but that they did so in a premeditated or retaliatory manner.  Accordingly, the Court finds that Plaintiffs have standing to pursue their claims against the State Defendants and the Court has subject matter jurisdiction.

### 2.  Conspiracy and Retaliation

As Plaintiffs put it, the "retaliation claim is the crux of their Complaint."  (Mem. Opp. Defs.' Mot. Dismiss at 36, July 5, 2022, Docket No. 36.)  Plaintiffs allege that Defendants retaliated through a conspiracy to arrest and detain protesters under false pretenses.

Plaintiffs' retaliation and civil conspiracy claims fail because they do not give rise to a "plausible suggestion of conspiracy" and cannot survive the *Iqbal/Twombly* standard. *See Twombly*, 550 U.S. at 566.  Although the Court must construe facts in favor of the non-moving party, the same is not true of legal conclusions, and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not

-18-

suffice." *Iqbal*, 556 U.S. at 678. "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* at 662 (internal quotations omitted).

To prove a 42 U.S.C. § 1983 conspiracy claim, a plaintiff must show: "(1) that the defendant conspired with others to deprive him of constitutional rights; (2) that at least one of the alleged co-conspirators engaged in an overt act in furtherance of the conspiracy; and (3) that the overt act injured the plaintiff." *White v. McKinley*, 519 F.3d 806, 814 (8th Cir. 2008) (citation omitted). Plaintiffs must also prove a deprivation of a constitutional right or privilege to prevail on their conspiracy claim. *Id.* The complaint must include specific and plausible allegations linking defendants to the overt acts that plaintiffs allege violated their rights. *See Faulk v. City of St. Louis*, *Missouri*, 30 F.4th 739, 747 (8th Cir. 2022) (dismissing civil conspiracy claim against officer who participated in response to protest).

To state a claim of First Amendment retaliation, Plaintiffs must allege that (1) they engaged in constitutionally protected activity; (2) that the Defendants took actions against Plaintiffs that would chill that activity; and (3) that the adverse action was motivated in part by the exercise of the constitutional rights. *See Scheffler v. Molin*, 743 F.3d 619, 621 (8th Cir. 2014).

Plaintiffs provide two factual allegations to support their conspiracy and retaliation claims: (1) the existence of an "Ops Plan" to conduct mass arrests, and (2) the arrest of a CNN journalist. These allegations are insufficient to surpass the *Iqbal* standard.

Plaintiffs first allege that Defendants distributed an Ops Plan to move protesters to the strip mall one block from Brooklyn Center Police headquarters and then to effectuate mass arrest. The Ops Plan allegedly stated at least in part, "Goal is mass arrest" and "Main event = strip mall parking lot." Defendants do not dispute the existence of the plan. But Plaintiffs provide no basis for the inference that the plan was to conduct mass arrest **without probable cause**. Although the existence of the Ops Plan is consistent with Defendants scheming to execute the plan without probable cause, it is no more consistent than with the theory that Defendants were planning on how to respond if the protest turned into a riot or protesters engaged in unlawful activity, and arrests became necessary.

It is reasonable that law enforcement would have a plan in place if the protests evolved into riots or the protesters otherwise engaged in unlawful activity. The fact that officers deployed in response to protests are typically equipped with riot gear does not mean that there is a plan to incite protesters. Similarly, having a plan on how to conduct mass arrests is not indicative that mass arrests will be conducted without justification.

Plaintiffs also point to the arrest of a CNN journalist who was arrested despite being a member of the press. Plaintiffs argue that state troopers must have prepared a

knowingly false statement of probable cause to detain her because she was subsequently

released without being charged.  But Plaintiffs are not entitled to that assumption.  The

fact that someone is subsequently released without being charged does not give rise to

the inference that there was a false probable cause statement.  It certainly does not lead

to the inference that there was a predetermined scheme to arrest people under false

pretenses of probable cause.  In fact, the Complaint itself endorses that the journalist was

**mistaken** as a protester.  (Compl. ¶ 42.)

Plaintiffs' Complaint is also deficient because a conspiracy "claim requires a

complaint with enough factual matter (taken as true) to suggest that an agreement was

made." *Twombly*, 550 U.S. at 556.  In this case, Plaintiffs do not point to any facts that

suggest a meeting of the minds, other than the existence of Operation Safety Net.

Further, regarding the retaliation claim, Plaintiffs must allege that Defendants

were motivated to retaliate against Plaintiffs, but they allege no facts from which ill intent

can be inferred.  *See Iqbal*, 556 U.S. at 686–87 (rejecting that intent may be pled

"generally" and instead must be supported by some factual allegation).

Plaintiffs point to *Goyette v. City of Minneapolis*, No. 20-1302, 2021 WL 3222495

(D. Minn. July 29, 2021), in support of all their claims.  In *Goyette*, the Court considered

similar claims of constitutional violations, civil conspiracy, and failure to intervene against

Commissioner Harrington and Colonel Langer arising out of the arrests of several

journalists covering the protests after the murder of George Floyd.  *Id.* at *1–2.  The defendants moved to dismiss all claims, but the Court denied the motions.  *Id.* at *12.

This case differs significantly from *Goyette*.  The journalists in *Goyette* clearly identified themselves as members of the press but were nonetheless subjected to the use of force, even though the curfews in place exempted the press.  *Id.* at *1.  Further, the journalists alleged misconduct towards journalists going back as far as six years.  *Id.* at *8. Whether the press must disperse when ordered to do so in these situations was a central question in the *Goyette* litigation.  In contrast, the named Plaintiffs in this case were intermingled with other protesters and were unquestionably subject to the many dispersal orders and curfews.  *See White v. Jackson*, 865 F.3d 1064, 1075 (2017) (finding that officers have probable cause to arrest protesters for refusal to disperse in violation of state law where an individual does not disassociate himself from the group assembled).

Additionally, the allegations in the *Goyette* complaint were far more detailed than in this case.  *See generally* 2nd Am. Complaint, *Goyette v. City of Minneapolis,* No. 20-01302, 2021 WL 3222495 (D. Minn. July 29, 2021) (Docket No. 53), 2020 WL 8838534. And in contrast to *Goyette*, the video incorporated into Plaintiffs' Complaint contradicts their claims that no precipitating event occurred prior to their arrests.  Therefore, *Goyette* does not lend support to Plaintiffs' claims in this case.

-22-

Accordingly, the Court will dismiss with prejudice the civil conspiracy and retaliation claims against all Defendants in their official capacity as well as all other official capacity claims.

### B.    Individual Capacity Claims

First, the Court will dismiss the individual capacity claims against each Defendant that are based on the civil conspiracy and retaliation claims.  Similar to their official capacity claims, Plaintiffs do not allege any facts suggesting a meeting of the minds among the named Defendants to enter into a conspiracy to violate protesters—the existence of Operation Safety Net is not enough.  Even if the Court construed the alleged Ops Plan as evidence of a conspiracy or plan to retaliate against protesters, Plaintiffs do not connect any of the named Defendants to the Ops Plan.  Plaintiffs also fail to allege the requisite overt act by the named Defendants other than generally supervising John Doe Defendants.  Finally, the retaliation claim fails because Plaintiffs have not alleged any facts evidencing that any of the named Defendants directed ill will towards protesters in the creation of policies and customs to handle protests.

Second, as to the remaining individual capacity claims, Defendants are directly responsible if the supervisor "participated in the constitutional violation" or if the "failure to train or supervise the offending actor caused the deprivation."[6]  *Parrish v. Ball*, 594

---

[6] Generally, "neither municipalities nor government officials may be held liable for unconstitutional conduct under a theory of respondeat superior."  *Rogers v. King,* 885 F.3d 1118,

F.3d 993, 1001 (8ᵗʰ Cir. 2010) (quotation omitted).  Thus, to determine whether Plaintiffs

sufficiently pled a claim to relief, the Court must determine whether Plaintiffs adequately

alleged that the named Defendants participated in the constitutional violations or failed

to train or supervise the offending law enforcement officers.

### 1. Commissioner Strommen

The Court finds that Plaintiffs do not plausibly allege constitutional violations by

Commissioner Strommen or any Department of Natural Resources ("DNR") conservation

officer.  The Complaint only makes brief mention of Commissioner Strommen to allege

that she was part of the response to the protest and the alleged conspiracy.  No specific

acts by the Commissioner are alleged.  There is no allegation that Commissioner

Strommen was present at the protest, or actively involved in directing the response.  The

Complaint mentions that DNR conservation officers were present, but no specific

allegations of excessive force are made about them.  Allegations that DNR conservation

officers arrested putative class Plaintiffs and zip tied them, without more, are not

sufficient to plead constitutional violations.  In fact, named Plaintiffs do not allege any

specific injuries that can be traced to a DNR conservation officer.  *See e.g., Armstrong v.

City of Minneapolis*, 525 F. Supp. 3d 954, 966–67 (D. Minn. 2021) (dismissing similar claims

against the Minnesota State Patrol because they were speculative and not specific

---

1122–23 (8ᵗʰ Cir. 2018).  Since respondeat superior is not available here, Plaintiffs must establish
that each Defendant is directly responsible for any violation of Plaintiffs' rights.

enough).  Similarly, all allegations related to Plaintiffs' detention are not against DNR conservation officers because they were not in the custody of the DNR.  Plaintiffs also allege that state troopers provided the relevant probable cause statements, not DNR conservation officers.  The remaining allegations against Commissioner Strommen and DNR conservation officers are either conclusory or state legal conclusions, rather than factual allegations.

Because Plaintiffs failed to allege that Commissioner Strommen participated in the constitutional violation or failed to train or supervise any offending DNR actors, the Court will dismiss all claims against Commissioner Strommen in her individual capacity with prejudice.

### 2. Sheriff Hutchinson, Commissioner Harrington, and Colonel Langer

In contrast to Commissioner Strommen, Plaintiffs make more detailed allegations against Sheriff Hutchinson, Commissioner Harrington, and Colonel Langer.  To prove that a supervisor is liable under the direct participation theory, Plaintiffs must prove that the supervisor was personally involved in the constitutional violation.  *See Buckley v. Hennepin Cty.*, 9 F.4th 757, 764 (8th Cir. 2021) (finding that a supervisor can only be held personally liable under § 1983 "when the supervisor is personally involved in the [constitutional] violation or when the supervisor's corrective inaction constitutes deliberate indifference towards the violation"); *see also Marsh v. Phelps Cty.*, 902 F.3d 745, 754 (8th Cir. 2018) (holding that if defendants neither "ordered or directed" a violation of plaintiff's rights, "their alleged liability cannot be based on direct

participation"). Plaintiffs do not allege that any of the Defendants were on the ground and directly ordered John Doe Defendants to take unconstitutional actions. Therefore, all their claims must rely on some form of supervisory liability.

To properly allege supervisory liability Plaintiffs must allege that a "failure to properly supervise and train the offending employee[s] caused a deprivation of constitutional rights." *Perkins v. Hastings*, 915 F.3d 512, 524 (8th Cir. 2019) (citation omitted). This requires a showing that: (1) the supervisor was on notice of a pattern of unconstitutional acts by subordinates; (2) that the supervisor was deliberately indifferent or tacitly authorized the pattern of unconstitutional acts; (3) that the supervisor failed to take sufficient remedial action; and (4) that the supervisor's failure to remedy the pattern of unconstitutional acts proximately caused the Plaintiffs' injuries. *Id.* Although failure-to-train and failure-to-supervise are governed by the same analysis, they are not the same theory of liability. *See Liebe v. Norton*, 157 F.3d 574, 579 (8th Cir. 1998).

### a. Freedom of Speech and Unreasonable Force and Seizure

Sheriff Hutchinson was the on-site commander directing the response to the protests, but Plaintiffs allege that Commissioners Harrington and Colonel Langer continued to supervise the state troopers. Plaintiffs argue that all Defendants must have been aware that state troopers and sheriff's deputies intermittently and without warning took "potshots" at protesters with 40mm less-lethal weapons via the centralized command and control operation. However, all allegations of actions specifically taken against Plaintiffs at the protests were alleged to be by state troopers.

*Failure to Train*

Presumably, Commissioner Harrington and Colonel Langer were responsible for the training of state troopers under their supervision.  However, Plaintiffs do not allege how the training of state troopers was deficient.  "Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights."  *Connick v. Thompson*, 563 U.S. 51, 62 (2011).  Therefore, Plaintiffs fail to plausibly plead failure to train claims against Commissioner Harrington and Colonel Langer.

There is no allegation that Sheriff Hutchinson trained any state troopers or state conservation officers.[7]  Therefore, because the alleged actions against named Plaintiffs were all by state troopers, and not sheriff's deputies under Sheriff Hutchinson's supervision, Plaintiffs also fail to state a failure to train claim against Sheriff Hutchinson.

*Failure to Supervise*

Generally speaking, serving as the chief of a police department is not sufficient to be held liable for all actions by officers.  *See Armstrong*, 525 F. Supp. 3d at 966. Accordingly, Sheriff Hutchinson argues that he cannot be held liable for the actions of John Doe Defendants simply by virtue of being the commanding officer.

---

[7] Defendants point out that the officers who arrested Hassan are not state troopers as Plaintiffs stated in their Complaint.  It is not clear which police department the officers belong to, but it is possible these officers have a fundamentally different relationship to Sheriff Hutchinson than the state troopers that Plaintiffs claim took most of the direct actions.

Plaintiffs have not adequately pled that Sheriff Hutchinson was "on notice of a pattern of unconstitutional acts by subordinates" because Plaintiffs fail to identify any previous misconduct by a state trooper under the command of Sheriff Hutchinson, much less a pattern of such misconduct.  *See Cole v. Does*, 571 F. Supp. 3d 1033, 1045–46 (D. Minn. 2021) (finding that plaintiffs did not plead a plausible failure-to-train or failure-to-supervise claim because they could not identify a single instance of excessive force committed by an officer under the command of the defendants).  Even if the events of the Daunte Wright protest alone could give rise to such notice, Plaintiffs' allegations of unconstitutional conduct are not sufficient to state a claim.  The crux of their allegations is that the John Doe Defendants took "potshots" at protesters without provocation, fired less-lethal munitions and tear gas into crowds without warning, and arrested them without probable cause.  However, the video evidence incorporated into the Complaint by Plaintiffs puts very much in doubt the claims that the officers acted without probable cause.[8]

Both Kaplan and Flom were with or near a crowd of people when they were arrested.  The video evidence shows that prior to the arrest of both Kaplan and Flom, munition was deployed, individuals kicked deployed gas cannisters back toward law enforcement, fireworks were set off, and objects were thrown from the crowd toward

---

[8] The John Doe officers remain unidentified in this case.  Without specific allegations against identified individuals, the Court cannot assess the actions of any given officer.  Therefore, the court analyzes whether probable cause existed by considering the events as a whole.

law enforcement, and there were multiple orders to disperse.  Although nothing in the video provides evidence that any individual named Plaintiff committed these acts, the video contradicts the assertions that law enforcement could not have had valid reasons for the arrests and instead supports a finding of probable cause.  *See Bernini v. City of St. Paul*, 665 F.3d 997, 1003 (8th Cir. 2012) (citing *Carr v. District of Columbia*, 587 F.3d 401, 408 (D.C. Cir. 2009)) (noting that "officers have grounds to believe all arrested persons were a part of the **unit** observed violating the law") (emphasis in original).

Hassan was not with a crowd when she was arrested and the video does not clearly show what immediately preceded Hassan's and her brother's arrest, but it does appear that Hassan and her brother were present past the curfew, which would be enough to provide probable cause for her arrest if she refused an order to disperse.  However, even assuming that Hassan has plausibly stated a claim against the John Doe Defendants who arrested her, this is still not sufficient to plead a failure to train or supervise against the named Defendants because a single incident is not enough.  *See Williams v. Willits*, 853 F.2d 586, 588 (8th Cir. 1998) (finding that a single previous or isolated incident is typically not enough for supervisory liability).  Because the Court agrees that Plaintiffs have failed

to state a claim to hold Sheriff Hutchinson's responsible for a failure to supervise, the Court will dismiss the First and Fourth Amendment claims against him without prejudice.[9]

With regard to Commissioner Harrington and Colonel Langer, Plaintiffs do not allege that they were directing the actions of law enforcement on the ground.  Like with Sheriff Hutchinson, Plaintiffs allege that the existence of centralized command structure means that Defendants were communicating extensively and must have been aware of unconstitutional actions.  However, Plaintiffs' allegations are not sufficient to establish a pattern of unconstitutional conduct that would have put Commissioner Harrington and Colonel Langer on notice.  Even if the Court were to assume that the Commissioner Harrington and Colonel Langer had such notice, Plaintiffs' claims fail because as previously discussed, the video evidence contradicts the claims of clearly unconstitutional actions by the John Doe Defendants.

Because Plaintiffs failed to allege sufficient facts that the Defendants had notice of the constitutional violations, they fail to state a claim under Rule 12(b)(6).  The Court will dismiss Plaintiffs' First and Fourth Amendment claims as to Commissioner Harrington and Colonel Langer with prejudice.

---

[9] The Court will dismiss without prejudice against Sheriff Hutchinson because of his unique role as the on-site commander and because the detention related claims are against staff directly under his command, leaving open the possibility that Plaintiffs may be able to allege more specific misconduct related to him.

### b. Excessive Detention

Plaintiffs claim that Defendants jailed them without probable cause and subjected them to prolonged detention and that Defendants did so in a willful and malicious manner.  Unlike with their First and Fourth Amendment claims, the claims of prolonged detention are more directly linked to sheriff's deputies and staff under the command of Sheriff Hutchinson because Plaintiffs were held at the Hennepin County jail.

Plaintiffs allege that they were each informed they were being booked on allegations of felony riot.  Kaplan and Flom were held for approximately 40 hours and ultimately charged with the misdemeanor of presence at an unlawful assembly, and not with riot.  Hassan was held for approximately 24 hours and was also charged with presence at an unlawful assembly and not with riot.

The Court concludes that Plaintiffs have not alleged specific facts that tend to show Sheriff Hutchinson, or the other Defendants, were on notice of a pattern of unjustified prolonged detention sufficient to warrant supervisory liability.  Additionally, the period of delay between Plaintiffs' arrests and the probable cause determination was under 48 hours, and therefore presumptively reasonable. *Cnty of Riverside v. McLaughlin*, 500 U.S. 44, 56 (1991) (holding that a jurisdiction that provides judicial determinations of probable cause within 48 hours of arrest complies with the promptness requirement under the Fourth Amendment).  Although Plaintiffs claim that any delay was motivated by ill will, they provide no specific factual allegations to support that assertion.  Therefore, the Court

will grant the motions to dismiss the claims related to their detention against all Defendants.

### c. Failure to Intervene

To establish a failure to intervene claim, Plaintiffs must show that Defendants "observed or had reason to know that excessive force would be or was being used." *Hollingsworth v. City of St. Ann*, 800 F.3d 985, 991 (8th Cir. 2015) (citation omitted). The defendant must also have had an opportunity to intervene and failed to do so. *Krout v. Goemmer*, 583 F.3d 557, 565–66 (8th Cir. 2009). The Eighth Circuit has only recognized a failure to intervene claim within the context of an underlying instance of excessive force. *Livers v. Schenck*, 700 F.3d 340, 360 (8th Cir. 2012).

Plaintiffs do not allege that Commissioner Harrington and Colonel Langer were present for the alleged incidents. However, they do allege that Sheriff Hutchinson, as the on-site commander, observed in real-time the alleged constitutional violations in the Complaint through the use of TV, radio, and other technologies as part of Operation Safety Net.

Even assuming that monitoring the situation on the ground through various forms of surveillance qualifies as "observing" for the purpose of a failure to intervene claim, Plaintiffs do not plausibly allege that Sheriff Hutchinson had the opportunity to intervene in any specific act of excessive force. Courts generally require that the officer be physically present in order to hold them liable for a failure to intervene. *See e.g., Green v. Pineda*, No. 19-22444, 2020 WL 5665161, at *8 n.7 (S.D. Fla. Aug. 26, 2020)

(differentiating a defendant from others because he was not present during the alleged application of excessive force, and thus not could not have intervened); *Alexander/Ryahim v. Gardner,* 5:04-00420, 2006 WL 8446223, at *2 (E.D. Ark. Oct. 5, 2006) (same). Therefore, Plaintiffs fail to plead a plausible claim for failure to intervene against all Defendants because they do not allege that any of them were physically present and had the opportunity to interfere in any alleged violation.

### d. False Imprisonment

Lastly, Plaintiffs' false imprisonment claims rely on the theory that they were arrested on false statements of probable cause. To state a claim for false imprisonment in Minnesota, Plaintiffs must plausibly allege that they were arrested without legal justification. *Riehm v. Engelking*, 538 F.3d 952, 969 (8th Cir. 2008). The arrest must also be "performed by the defendant." *Strei v. Blaine*, 996 F. Supp. 2d 763, 789–90 (D. Minn. 2014).

Plaintiffs do not allege that any of the named Defendants arrested them. Rather, they allege that state troopers arrested them and provided the probable cause statements. Therefore, Plaintiffs fail to state claim of false imprisonment against the named Defendants. Furthermore, as previously discussed, the video evidence incorporated into the Complaint calls into question the claim that no probable cause existed for Plaintiffs' arrests. Kaplan and Flom were part of a crowd that refused multiple dispersal orders and may have engaged in unlawful activity; and Hassan was present at the protest despite the curfew in place. For the reasons previously stated, Plaintiffs have

not plausibly pled that they were arrested without probable cause.  *See Johnson v. Morris,*
453 N.W.2d 31, 36 (Minn. 1990) ("If probable cause to arrest exists, the subsequent arrest
is lawful and there is no cause of action for false arrest or false imprisonment.").
Therefore, the false imprisonment claim against all Defendants fails.

### 3.  John Doe Defendants

There is no prohibition on filing actions against unknown defendants.  However,
John Doe defendants must be identified and served within 90 days of the commencement
of the action.  Fed. R. Civ. P. 4(m).  In some limited cases, an action may proceed against
a party whose name is unknown if "the complaint makes allegations specific enough to
permit the identity of the party to be ascertained after reasonable discovery."  *Est. of
Rosenberg by Rosenberg v. Crandell*, 56 F.3d 35, 37 (8th Cir. 1995).  Because more than 90
days have passed, and because Plaintiffs' allegations are not specific enough to identify
John Does #1–10 after the named parties are dismissed, the Court will dismiss all claims
against John Doe Defendants without prejudice.

### CONCLUSION

The Court finds that it has subject matter jurisdiction over the claims against the
State Defendants but because Plaintiffs have not alleged facts sufficient to support their
official or individual capacity claims against Commissioner Strommen, Commissioner
Harrington, and Colonel Langer, the Court will grant their motions to dismiss and
dismisses all counts with prejudice.  The Court will also grant Sheriff Hutchinson's motion
to dismiss and dismisses each official capacity claim with prejudice and each individual

capacity claim without prejudice.  The Court dismisses all claims without prejudice against John Doe Defendants #1–10 because they have not been identified in accordance with the Federal Rules of Civil Procedure.

Undoubtedly, the Plaintiffs' experience protesting the killing of Daunte Wright was unpleasant and difficult.  Being arrested and held for even a short period of time is a severe burden.  But the allegations as currently pled in the Complaint do not state a viable cause of action against the named law enforcement officials and thus the case must be dismissed, as outlined in this opinion.  Dismissals without prejudice may be re-filed, but the facts alleged must be sufficient to state viable claims.

**ORDER**

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.  Defendants' Motions to Dismiss [Docket Nos. 13, 19, and 25] are **GRANTED.**

2.  Plaintiffs' action is **DISMISSED with prejudice** with respect to Defendants Strommen, Harrington, and Langer.

3.  Plaintiffs' action against Hutchinson in his official capacity is **DISMISSED with prejudice**.

4.  Plaintiffs' action against Hutchinson in his individual capacity is **DISMISSED without prejudice**.

5.  Plaintiffs' action against John Does #1–10 is **DISMISSED without prejudice.**

**LET JUDGEMENT BE ENTERED ACCORDINGLY.**

DATED:  February 7, 2023
at Minneapolis, Minnesota.

JOHN R. TUNHEIM
United States District Judge